## Commonwealth Trust Co. Case.

## Union Real Estate Investment Co. Case.

Argued April 12, 1938.   Before SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Mark T. Milnor,* for appellants.

*Paul H. Rhoads,* with him *John Fox Weiss,* of *Weiss & Rhoads,* for appellees.

OPINION BY MR. JUSTICE BARNES, October 3, 1938:

The question before us in these appeals is whether there should be sustained various items of surcharge which the court below imposed upon the appellant, Commonwealth Trust Company (referred to as the "Trustee"), in the accountings made by it as trustee of an issue of mortgage bonds, and as trustee under a deed of trust.

There are no facts in dispute. In 1926 the Union Real Estate Investment Company, as the owner of a tract of land in the City of Harrisburg, subdivided it into building lots, and undertook to develop the property as a restricted residential section, to be known as Bellevue Park. To finance the venture, on July 1, 1926, it executed and delivered a $100,000 first mortgage upon

the property to the Commonwealth Trust Company, as trustee, to secure a like amount of fifteen-year 6% Gold Mortgage Bonds to be issued thereunder. The entire issue was purchased by the commercial department of the trust company for $95,000 and thereafter the bonds were resold at par, principally to estates of which the trust company was trustee.

The mortgage indenture provided that $35,000 of the proceeds of the bonds should be retained by the Trustee as a revolving fund for the purpose of financing the construction of houses to be erected by the real estate company in the development. The sums so advanced were to be returned to the fund upon the sale of the improved lots, and in this manner the fund was to be maintained for future financing of houses. The indenture also provided that a sinking fund be created for the retirement of bonds, and for this purpose it was stipulated that the Trustee should release from the mortgage the lots sold only upon payment to the sinking fund of 40% of the selling price of each lot.

The Bellevue Park lots did not sell as rapidly as anticipated, with the result that the real estate company was forced to borrow from the trust company, in order to pay the semi-annual installment of interest on the bonds falling due July 1, 1927. As security for this and additional sums advanced, on November 22, 1927, a second mortgage upon the property in the sum of $50,000 was given to the trust company. Subsequently the real estate company was unable to meet the interest payments on the bonds falling due January 1, 1930, and July 1, 1930. These defaults were cured with funds again obtained from the trust company upon a third mortgage for $22,000 dated December 29, 1930.

Two days later, on December 31, 1930, the property was conveyed to the trust company by a deed which expressly provided that the conveyance should not work a merger of the title with the three mortgages. It was collaterally agreed that the trust company should hold

and manage the property in trust for the purpose of discharging all of the mortgage indebtedness, any balance remaining to be returned to the real estate company.

Briefly stated, under the management of the Trustee, on March 18, 1936, the amount of bonds outstanding under the first mortgage had been reduced to $55,700 and interest paid thereon to January 1, 1933, the second mortgage to $46,385.09, with interest paid to December 1, 1932, and the third mortgage to $20,220 with interest paid to June 29, 1932. There was also a balance on hand amounting to $13,856.99, which included a mortgage of $5,400.

On March 18, 1936, the Trustee resigned, and a substituted trustee was elected by the bondholders. Thereafter the trust company filed in the court below a "First and Final Account" as trustee under the mortgage. Numerous exceptions, alleging for the most part failure to account for sums received, were filed to this account, which was called the "Mortgage Account." Thereupon the trust company filed a second account, entitled "First Account as Trustee under Deed of Trust," in which it set forth its dealings relating to the mortgaged property subsequent to the conveyance date of December 31, 1930. To this latter account the substituted trustee also filed exceptions. In both sets of exceptions the substituted trustee was joined by the holder of the majority of the outstanding bonds. No exceptions were filed to either account on behalf of the real estate company.

The proceedings upon the two accounts were consolidated by the court below and referred to an auditor, who, after hearings, sustained certain of the exceptions to the accounts. In his report he surcharged the accountant for a total of $1,595.11 in both accounts, in addition to disallowing a claim for compensation in the amount of $1,575. The court below, after argument upon exceptions to the auditor's report, increased the total surcharges to $87,050.82, and also disallowed ac-

countant's claims for compensation. From the decree of the court below the Trustee has taken these appeals.

The mortgage account purports to be a complete statement of the transactions of the Trustee under the first mortgage. It is stated in two schedules; one shows the handling of the revolving fund set up by the trust indenture, and the other sets forth the operation of the sinking fund. The revolving fund schedule discloses a loss of $22,822.46, representing sums advanced to the real estate company for building and other purposes, and not repaid. The sinking fund schedule accounts for the 40% of the selling price of each lot which was paid for releases. This fund, together with a balance taken over from the revolving fund,[1] was used for the purchase and retirement of first mortgage bonds to the face amount of $44,300, leaving a balance of cash on hand of $511.98. As stated, the first mortgage was reduced to $55,700 as the result of the operation of this fund.

In the deed account, treating of its management of the property, the Trustee charges itself with the sums received for lots sold after it took title, and claims credit for various expenses of management, such as cost of sales, taxes, insurance, interest on the bonds and mortgages, and payments to the sinking fund. The account shows a balance on hand of $13,345.01, including a mortgage of $5,400 taken in part payment for one of the properties sold.

Both the auditor and the court below found numerous errors and inaccuracies in the Trustee's accounting. While the findings of the auditor were directed principally toward reconciling the two accounts, the court below held that the Trustee had failed to perform its duties on behalf of the bondholders, particularly that it

---

[1] After the trustee took title to the property on December 31, 1930, it was decided not to erect any houses on the remaining lots, but to sell the lots and houses already constructed. In consequence, on May 12, 1931, the sum of $12,266.70 was transferred from the revolving fund to the sinking fund.

had neglected to pay over to the sinking fund the entire proceeds received from lots sold after it had taken over the management of the mortgaged property. In addition, the court disallowed certain payments for which the Trustee claimed credit, as incompatible with its trusteeship.

According to the Trustee the surcharges imposed by the court below work great injustice. It concedes that its bookkeeping may have been at fault, and that in some instances sums should have been included in the mortgage account which are shown in the deed account. It contends, however, that the two accounts faithfully show all receipts and expenditures in connection with the Bellevue Park property. We have no doubt that such is the fact. It is, however, not a sufficient defense against surcharge for a trustee to show for what purpose trust funds were spent; it must justify every expenditure as a proper one according to the terms of the instrument under which it is acting, or the power and authority conferred upon it.

This case presents no novel question of law. The loyalty which a trustee owes to his beneficiaries is the basic factor of trust relationship. Once the trust is accepted it must be administered solely in the interest of the beneficiaries. The application of this principle is determinative of all the issues presented by these appeals: *Quell v. Boyajian,* 90 Pa. Superior Ct. 386; Restatement, Trusts, section 170; Bogert, Trusts and Trustees, sections 484, 543. This rule is stated in Story's Equity Jurisprudence (14th ed.), section 446, in the following language: "In short it may be laid down as a general rule that a trustee is bound not to do anything which can place him in a position inconsistent with the interests of the trust, or which have a tendency to interfere with his duty in discharging it." See also *Raybold v. Raybold,* 20 Pa. 308; Restatement, Trusts, section 203. It is a corollary of this rule that a trustee may not profit at the expense of the beneficiaries nor assert any adverse

interest in the trust property: *Krauczunas v. Hoban,* 221 Pa. 213, 224; *Harris v. Silvis,* 86 Pa. Superior Ct. 222.

Here it is apparent that the Trustee's difficulties are due to the fact that it attempted to act in several antagonistic capacities at one time. It was the trustee for the holders of the first mortgage bonds. It marketed the entire issue of bonds and sold a large portion of them to estates of which it was trustee. It took junior mortgages upon the same property. It then took title to the property and attempted to hold and manage it for the benefit of the original owner, the mortgage debtor. It would not be surprising if the Trustee, torn between such divergent interests, failed at times to discern the direction in which lay its duty of loyalty. There is afforded here a striking example of the truth of the ancient maxim, still deeply rooted in the law, that no man can serve two masters.

The Trustee's confusion is further exemplified by the fact that it stated two accounts. It should have included in the mortgage account the items set forth in the deed account, using a separate schedule, if desirable, for the purpose of clarity. Apparently it intended the mortgage account as an accounting of its trust for the creditor-bondholders, while the deed account was an accounting of its trust for the debtor-real estate company. It was improper for the Trustee to attempt to segregate in this manner its dealings with the mortgaged premises. It could not at the one time be trustee of the same property under two different trusts for different beneficiaries, whose interests were conflicting. Having undertaken originally to act as trustee under the first mortgage, its primary obligation at all times thereafter was to the bondholders. When, therefore, it took title to the property, it held that title on their behalf, and not for the benefit of the real estate company: *Church v. Winton,* 196 Pa. 107; *Kenworthy v. Equitable Trust Co.,* 218 Pa. 286; *Harris v. Silvis,* supra.

However, in view of the provision in the deed that there should be no merger of the legal and equitable titles, the transaction did not amount to an amicable foreclosure and actual taking over of the property by the bondholders. In our opinion the situation was analogous to that where a trustee, holding a defaulted mortgage, enters into possession of the mortgaged property as mortgagee in possession.

As such the Trustee was entitled to remain in possession of the mortgaged property until the mortgage debt was paid in full. It was liable to perform the duties of a provident owner, and required to account to the mortgage debtor for its management of the property. In this restricted sense only was it the trustee for the real estate company: *Randal v. Jersey Mtge. Inv. Co.*, 306 Pa. 1; *Bulger v. Pleet*, 101 Pa. Superior Ct. 168; *Integrity Trust Co. v. St. Rita B. & L. Assn.*, 112 Pa. Superior Ct. 343; 317 Pa. 518. The trust company, after taking title and possession of the property, became obligated to pay the taxes and other costs in general of maintaining the land, and was entitled to a credit for the expenses incurred in selling the lots. Any balance then remaining should have been applied to the discharge of the principal and interest due the holders of the first mortgage bonds. When the Trustee made payments to itself on account of principal and interest due upon the second and third mortgages, it was acting adversely to its cestuis que trustent, and such payments were improper.

Turning to the particular surcharges, there appear to be twenty-four separate items, each one made the subject of a separate assignment of error. We shall refer to them for the most part in the same order in which they have been considered by the court below, limiting our discussion, of necessity, to the more important ones.

The first two surcharges relate to the refusal of certain credits claimed by the Trustee for payments made out of the revolving fund. Advancements to the real

estate company for the building of two houses were not repaid to the fund when the Trustee sold the improved properties.[2] The trust company admits that in these instances it did not comply with the trust indenture, but excuses itself upon the ground that the properties did not sell at prices sufficient to repay the advancements. It contends that since it was not possible to make repayment in full of these sums out of the proceeds of the sales, it was justified in making no payments whatsoever. This defense is unacceptable. If the selling prices were insufficient to return such amounts in full, they should have been applied to the extent possible, and the deficits resulting should have been made up by the real estate company. As the latter had no assets with which to satisfy these deficits, the duty of the Trustee does not extend beyond its obligation to repay to the revolving fund the net proceeds received from the sales. The amounts obtained for these two properties were included in the deed account. Therefore, the matter may be corrected by the Trustee's accounting in the revolving fund schedule for the sale of the two properties benefited by these advancements. (Surcharges No. 1 and No. 2.) Furthermore, the interest received on the purchase-money mortgages on these properties should also be transferred to the revolving fund schedule. (Part of Surcharge No. 11.)

The Trustee was also surcharged for advancements made from the revolving fund for the payment of construction costs on certain houses *after they had been sold*. It was impossible to obtain reimbursement from the "proceeds of the sale," as the trust indenture requires, since the selling prices of the properties had already been paid to the real estate company. Such pay-

---

[2] These two surcharges involve the sum of $9,884.75 which was advanced for the construction of property No. 2301 Valley Road, and the further sum of $11,202.89, advanced to build No. 2204 Valley Road, upon the development.

ments from the fund were improper, and the surcharge must be sustained. (Surcharge No. 3.)

Another surcharge relating to the revolving fund requires consideration. The fund was deposited in the commercial department of the Trustee, and interest was paid on the balance thereof not in use. When the Trustee took title to the property it paid over to the real estate company the interest earned upon the deposit. In our opinion this surcharge should be sustained. The Trustee was not entitled to a credit for this payment. Almost from the inception of its operations the real estate company was in financial difficulties, and the Trustee should have foreseen that the mortgage might fall into default. It was its duty to retain for the benefit of the bondholders the interest earned by the fund, which it held as a portion of the trust res. (Surcharge No. 5.)

The Trustee was surcharged for its failure to account for payments of $2,900 and $1,720 which it received for releases upon the sale of two lots. Although it appears from records in the office of the Recorder of Deeds that the president of the trust company receipted for the amounts so paid, at no place in the accounts does the Trustee show the receipt thereof. At the hearings no explanation of this discrepancy was offered. We see no error in the action of the court below in surcharging the Trustee and requiring it to place in the sinking fund the sums which it certified it had received for that purpose. (Surcharges Nos. 6 and 7.)

The court below held that in the purchase of mortgage bonds for retirement the Trustee violated its duty by paying more than the market value of the bonds after they had fallen into default. It is conceded by the exceptants to these accounts that the evidence does not support the findings of the court below, and the decree should in this respect be modified. We are in accord therewith and decide that these surcharges, amounting to $13,626.69, are not sustained. (Surcharges Nos. 8 and 9.)

The Trustee contends that it was error for the court to decide that it should have paid *into the sinking fund,* not only 40% of the purchase price of lots for releases, but also the remaining 60% of all sales made after it took title to the property, together with the rents and other income received. This action resulted in surcharges of over $36,000 for identical amounts included in the deed account. It is earnestly argued that the effect of placing these items in the mortgage account is to deny the Trustee credit for them as expenditures shown in the deed account. We do not believe that the court intended to deny a credit for the proper expenses incurred by the Trustee in the operation of the property. It seems clear to us that these surcharges do not increase the deficiency for which the Trustee must answer, but merely require that the amounts in question be transposed to the mortgage account. With the transfer of appropriate items of debit and credit the objections of the Trustee will be answered, and it will have received all credits to which it is entitled. For these reasons the surcharges are sustained. (Surcharges Nos. 10, 12, 16, 19, 20, and part of No. 18.)

During its management of the property the Trustee made temporary loans from its commercial department in order to meet current expenses of operation. It seeks repayment of these advances, amounting to $8,929.98, out of the funds now on hand. If the proceeds of sales had been used for proper purposes these borrowings would not have been required. Under the circumstances, the Trustee cannot claim a priority in order to recoup itself for loans made necessary by its own misconduct. This claim can be asserted only after the bondholders have been paid in full. In refusing this claim the court below did not, as the Trustee contends, impose a surcharge, except to the extent of $376.87, representing interest which the Trustee paid to itself upon these notes. (Surcharge No. 13.)

Another item of surcharge involves the so-called "secret profit" made by the Trustee at the time it purchased the entire issue of mortgage bonds for $95,000. The bonds were then marketed by the Trustee at their par value of $100,000. The court below held that the taking of this profit was a breach of trust; that it must be surrendered to the bondholders. While the practice of having the same institution act as banker for a bond issue, and as trustee of the mortgage securing the bonds, is of doubtful propriety, corporate bond issues have frequently been made in this manner.[3] We cannot, therefore, hold that the Trustee must pay over its entire profit to the bondholders. It appears, however, that $53,000 face value of the bonds were sold at par to its trust estates. To the extent of the profit made upon these sales there was clearly a breach of trust: *Tracy et al., Co-Trustees, v. Central Trust Co.,* 327 Pa. 77; Restatement, Trusts, sections 170, 206. We conclude that the Trustee must account for and return to the sinking fund all profits realized by sale of the bonds to estates of which it was trustee; this amounts to the sum of $2,650. To this extent the surcharge is sustained. (Surcharge No. 14.)

In two further instances surcharges were imposed for the Trustee's failure to account in the sinking fund for the proper amounts received for releases of lots. In one case the sum of $343.80 was paid into the fund for the release of a lot from the mortgage. The deed account shows that there was paid $1,109.91 for this lot, of which the sinking fund should have received 40%, or $443.96. The Trustee was properly required to account in the sinking fund schedule for the difference of $100.16. (Surcharge No. 17.) It also sold a lot for $1,150 and released it from the mortgage. In the deed account it claims credit for a payment into the sinking fund of 40% of the price, or $460. The latter account does not

---

[3] See McClelland and Fisher, Corporate Mortgage Bond Issues (1937), page 782.

show receipt of such sum. The portion of this surcharge requiring payment of the release amount into the sinking fund is clearly proper. (Surcharge No. 18.)

As we have seen, the Trustee failed in so many instances properly to perform its fiduciary duties that the court was justified in disallowing its claims for compensation. (Surcharges Nos. 15 and 21.) The audit was made necessary by its breaches of trust. It cannot, therefore, be allowed compensation for services to the trust, and must be required to bear the expenses of the audit: *Reich's Estate,* 230 Pa. 55; *Grollman's Estate (No. 2),* 273 Pa. 565; *Kline's Estate,* 280 Pa. 41. (Surcharge No. 24.)

We have referred to the more important surcharges imposed by the court below. The remaining ones involve no changes in the figures of the accounts as stated by the Trustee, and therefore require no discussion.

During the pendency of these proceedings the first mortgage was foreclosed by the substituted trustee, and a sale of the property upon a bid of $45,500 subject to taxes and liens of approximately $24,000 was confirmed by the court. We are informed, by stipulation of the parties, that the sum of $35,444.54 in addition to the proceeds of the sale, will be sufficient to reimburse the bondholders in full, and is the maximum amount which the substituted trustee is now entitled to receive. As a result of the modifications which we have made in the surcharges imposed by the court below, the Trustee's accounts, properly stated, show a total balance in excess of that figure, as appears by the following summary:

| REVOLVING FUND SCHEDULE | Account as Stated by Trustee | Account After Surcharges by Court Below | Account as Modified by This Opinion |
|---|---|---|---|
| Receipts | $84,125.15 | $106,429.40 | $99,168.97 |
| Expenditures* | 84,125.15 | 81,764.63 | 81,764.63 |
| Balance | | $24,664.77 | $17,404.34 |

* Including $12,266.70 paid into the sinking fund.

| SINKING FUND SCHEDULE | Account as Stated by Trustee | Account After Surcharges by Court Below | Account as Modified by This Opinion |
|---|---|---|---|
| Receipts | $47,302.97 | $94,109.33 | $55,133.13 |
| Expenditures | 46,790.99 | 31,211.30 | 44,837.99 |
| Balance | $511.98 | $62,898.03 | $10,295.14 |
| DEED SCHEDULE | | | |
| Receipts | $79,922.29 | $58,340.00 | $63,588.13 |
| Expenditures | 66,577.28 | 94,142.78 | 54,036.98 |
| Balance | $13,345.01 | (Deficit) | $9,551.15 |
| TOTAL AVAILABLE FOR RETIREMENT OF BONDS: | $13,856.99 | $87,562.80 | $37,250.63 |

We have prepared as a part of this opinion an Appendix, which sets forth the revisions which we have made of the accounts of the Trustee, and which gives in detail the items composing the totals as stated in the foregoing summary. As these figures are of interest only to the parties, this Appendix will not be printed in the State Reports.

With these corrections there will be a balance on hand of $37,250.63 available for the retirement of the bonds. This sum, together with the amount realized by the foreclosure sale, will be sufficient to pay off the bondholders in full and provide a surplus which may be used for the payment of any proper claims of the Trustee against the fund.

The decree of the court below is modified, and the record is remitted to the court below that an order may be made carrying into effect the modifications made by this opinion and the Appendix attached hereto. Costs to be paid by appellant.