Lewis Estate.

Argued April 20, 1944. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and HUGHES, JJ.

*Charles C. Lark,* for appellant.

*Robert M. Fortney,* for appellee.

OPINION BY MR. JUSTICE HORACE STERN, May 22, 1944:

This appeal questions the imposition upon a testamentary trustee of a surcharge arising out of an allegedly improper investment of the trust fund and general mismanagement of the trust estate.

William B. Lewis died in 1925. In his will he bequeathed the sum of $15,000 to Dime Trust and Safe

Deposit Company of Shamokin, Pa., in trust to invest the same in "good, safe, income bearing securities," and to pay the net income for the use, benefit and education of his grandson Jacob Bauer Neihoff for a profession of his choice, with authority to the trustee, if the income should prove insufficient, to use and expend so much of the principal as might be necessary for the purpose; when the grandson fully completed his education the then unexpended balance of the fund was to be paid to him provided he had then attained the age of 21 years, and, if not, then when he should attain that age. The testator created another trust, with the same trustee, of the sum of $2,000, the net income to be used for the maintenance of testator's cemetery lots. The residuary estate was bequeathed and devised to the same trustee in trust for his wife and daughter. The Trust Company was also named as executor of the will and was to receive as compensation for its services as executor and trustee a commission not to exceed two percent.

We are concerned in this proceeding only with the trust established for the benefit of the grandson, Jacob Bauer Neihoff.

In 1922 the Trust Company made a mortgage loan of $20,000 through its commercial department to a director of the Trust Company and two associates; the mortgage was on a property in Shamokin, bore interest at six percent, and was payable in six months from the date thereof, indicating that it was taken only on the basis of a temporary and not a long-term loan. The mortgage was not acquired as an investment for trust funds, but in 1926, at which time it had been reduced to $17,000, it was assigned by the Trust Company to itself as Executor of the last Will and Testament of William B. Lewis, deceased; a notation was made on the books of the Trust Company that $15,000, constituting the Neihoff trust, and $2,000, constituting the cemetery trust, were invested in this mortgage; no formal assignment to itself as trustee was ever executed or recorded.

The investment proved an unhappy one. After a number of years there was default in the interest payments, then payments at irregular intervals, and finally, on December 31, 1936, the National-Dime Bank of Shamokin, Pa. (successor, by merger, to Dime Trust and Safe Deposit Company of Shamokin, Pa.), was obliged to take over the premises from the mortgagors; this it did by a deed to itself as grantee, but with a clause that the conveyance was in trust for the uses and purposes designated in the last will and testament of William B. Lewis, deceased. Following the taking over of the property the Bank carried it year after year at a continuous loss; in fact the expenditures for its upkeep were nearly twice as much as the rental income.

The Trust Company, as executor, filed three accounts, the last in 1930, but no account was filed of the Neihoff trust until 1941 when the beneficiary had come of age and completed his education. At no time had he been advised of the purchase of the mortgage, nor that money which had been sent to him by the trustee from time to time was not trust income but loans on which the Bank was charging him interest at the rate of six percent per annum.

The account filed by the trustee was stated in such a confused manner that it furnished but meagre information and required considerable oral explanation. Numerous exceptions to it having been filed, an auditor was appointed who heard testimony, restated the account, and filed a report recommending a surcharge of $5,025.11 with costs which included a fee for the auditor of $3,000. The court confirmed the report after eliminating some of the cost items and reducing the auditor's fee to $2,000.

The principal question is the validity of the mortgage investment. We are in accord with the conclusion reached by the auditor and the court below that the transfer of the mortgage from the commercial department of the Trust Company to itself as fiduciary was invalid. It is proper for a bank or trust company to

acquire a mortgage with the purpose of making it a trust investment, and, having earmarked it accordingly, within some short period thereafter to assign it to itself as trustee of some estate. But where, as here, the mortgage was originally taken for the Trust Company's or its director's own purposes, and was transferred by its commercial department four years later to itself as Executor, the transaction is forbidden by the mandate of the law that a corporation cannot, any more than an individual, sell its own property to itself as fiduciary; in such a case the beneficiary can repudiate the investment and compel the trustee to restore the amount of the purchase price with interest: *Tracy, et al., Co-trustees, v. Central Trust Company,* 327 Pa. 77, 192 A. 869; Restatement, Trusts, §170(i); Scott on Trusts, Vol. 2, p. 878 et seq., §170.13; cf. Act of May 15, 1933, P. L. 624, §§1109-1, 1111, as amended by the Act of June 24, 1939, P. L. 731.

Apart from this fundamental objection the mortgage in question was vulnerable also in other respects. The decedent's will provided that the trust fund for Neihoff was to be an expendable one, and it must have been obvious that large advancements would have to be made to the beneficiary, especially during the years of his higher education; as a matter of fact the entire amount of the principal was expended by the trustee so that when the account was filed it showed nothing whatever, either of principal or income, due to the beneficiary. With the likely necessities of the situation in mind the trustee should not have invested and maintained the fund in a single large, non-amortizable mortgage, with the result that the fluidity necessary to make the payments of principal contemplated by the terms of the trust was lacking; the consequence of "freezing" the fund in this uncollectible mortgage was that the Trust Company was obliged to advance to the beneficiary for maintenance and education during the years of the trust sums aggregating the entire amount of the prin-

cipal, $15,000, for which it charged interest at six per-cent per annum, so that instead of having the use of the principal as designed by the testator the beneficiary was not only obliged to pay for the money he obtained but at a rate far greater than the income received from the investment. Nor did the accountant offer any testimony to establish that the mortgage was a reasonably safe one even from the beginning. Although the burden was placed upon it to justify the investment and to show that it exercised proper care in the purchase of the mortgage for the trust estate, it made no attempt to prove the value of the property at that or any other time, but contented itself with the mere statement that the decedent had himself negotiated with the bank for the purchase of this mortgage although the transaction was not ultimately consummated by him. During the fifteen years between the transfer of the mortgage to the decedent's estate and the filing of the trustee's account the entire net proceeds realized from the operation of the trust were approximately $2,000, or less than one percent per annum on the principal of the fund. The bank is now taking the property over in its own right in payment of the advances of $15,000 which it made to the beneficiary.

The court below, following the recommendation of the auditor, properly eliminated the mortgage from the account altogether as an improper and invalid investment, restored the principal of $15,000, and allowed the beneficiary four percent per annum interest thereon with appropriate deductions for the gradual depletion of the fund by the periodic advancements which were made to him. The Fiduciaries Act of 1917, P. L. 447, §44(b), provides that "The amount of interest to be paid in all cases by fiduciaries shall be determined by the orphans' court, under all the circumstances of the case . . ." The rule is that (where the trustee has made no profit for himself) the interest rate should be such as will equal the return which would have been received

had the trustee performed his duty: *Wilbur's Estate,* 334 Pa. 45, 65, 5 A. 2d 325, 335. In this connection the auditor properly took into consideration the amount that could fairly be obtained from investments during the various years while the trust was in operation (cf. *Kenin's Trust Estate,* 343 Pa. 549, 563-566, 23 A. 2d 837, 844, 845) ; four percent was the rate adopted in *Stirling's Estate,* 342 Pa. 497, 508, 21 A. 2d 72, 77.

It is urged by appellant that, even if originally invalid, the investment was validated by the Act of June 24, 1939, P. L. 739, but, apart from any question as to the constitutionality of that act which it is here unnecessary to consider, it applies only where a bank or trust company has purchased with funds held by it as fiduciary a mortgage or other asset owned by it and held in its commercial department, and the purchase was made in good faith, without profit to the bank or trust company, and otherwise in compliance with law. To obtain the benefit of the act it must clearly appear that the transaction was not designed to accomplish the unloading of a questionable investment upon the trust. The burden to prove that it acted in good faith and with due care in the purchase of the mortgage on behalf of the trust estate was not sustained by the accountant; there was here not merely a technical violation which the act was intended to cure and accordingly the protection of the act may not be invoked.

The court properly disallowed interest on the moneys advanced by the Trust Company from time to time to the beneficiary because if the fund had been properly invested no such loans would have been necessary. Nor was the accountant entitled to commissions or counsel fees. It attempted to collect a commission of five percent notwithstanding that it accepted the executorship and the trusteeships under a will which expressly provided for a compensation of not more than two percent, but, apart from this, there were such gross irregularities, and such negligence in many phases of administration

of the trust estate and in the accounting, as to disentitle it to commissions altogether: *Kline's Estate,* 280 Pa. 41, 49, 124 A. 280, 283; *Commonwealth Trust Company Case,* 331 Pa. 569, 582, 1 A. 2d 662, 668. There was scarcely a single item in the account which did not require explanation, and, when explained, several of the expenditures were shown, and even admitted, to have been improper. As for the challenged counsel fees there was no attempt on the part of the accountant to justify them by showing the nature and extent of the services rendered or the reasonableness of the charges; it would seem that much, if not most, of the work of counsel was devoted to transactions connected with the mortgage and the real estate, and for that the beneficiary would not be liable.

Complaint is made that the auditor exceeded his authority in restating the account, but the restatement was absolutely necessary, for otherwise the account would have been neither correct nor intelligible; there were lumping items galore, and items of administration and distribution and of principal and income were blended. Even if in this or other respects the auditor passed upon matters not submitted to him the irregularity was cured by the court's approval and confirmation of his report, this being tantamount to a previous enlargement of his authority: *Bloom's Appeal,* 106 Pa. 498. And the accountant must bear the cost of the audit because it was its fault that it became necessary: *Kline's Estate,* 280 Pa. 41, 49, 124 A. 280, 283, 284; *Commonwealth Trust Company Case,* 331 Pa. 569, 582, 1 A. 2d 662, 668.

As to one matter we are not in complete accord with the conclusion of the court below and that is in regard to the allowance of compensation to the auditor. An auditor's fee is measured by the character and volume of the work done, the nature and difficulty of the questions involved, the time necessarily required, and similar elements: *Wilbur's Estate,* 334 Pa. 45, 74, 5 A. 2d

325, 339. An inspection of the present record indicates that the auditor performed his work with commendable diligence and marked ability, but we cannot overlook the fact that there were only five hearings of which two were extremely short, the testimony was not lengthy and the legal questions raised were not particularly complicated. Regard must also be had, of course, to the amount involved in the accounting. Under all the circumstances we are of opinion that $1,000 would be a proper allowance for the services of the auditor.

The decree, as modified, is affirmed; costs to be paid by accountant.