Landis Trust.

488

Argued April 25, 1955. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Robert T. McCracken,* with him *Norman von Rosenvinge* and *Edward G. Taulane, Jr.,* for beneficiary appellant.

*Edwin D. Strite,* with him *E. M. Biddle, Jr.,* and *N. F. Keller,* for trustee appellant.

490

OPINION BY MR. CHIEF JUSTICE HORACE STERN, June 27, 1955:

These are appeals from an adjudication and final decree rendered by the Court of Common Pleas of Franklin County sur the final account of the First National Bank and Trust Company in Waynesboro, as substituted trustee of certain trusts. The account was filed at the time of the termination of the trust in 1937, and a supplemental account in 1948. The matters involved in the operation and administration of the trust were so complicated, and the litigation seeking their disposition has been so long continued, that it is difficult if not impossible to discuss them in detail within the limited compass of a judicial opinion. They were all carefully analyzed by Judge SHEELY in the court below in a comprehensive and painstaking adjudication.

Frank F. Landis was an industrialist with extremely valuable interests in the Landis Tool Company, the Landis Machine Company, the Landis Engineering & Manufacturing Company, and other corporations located in Waynesboro, Pennsylvania. He had three daughters, Elizabeth L. Hershey, Ida M. L. Smith, Anna L. Sollenberger, and a son, Mark H. Landis. On January 20, 1917, he executed an instrument in writing in which he provided that the stocks which he owned in those corporations should be held by his son as trustee for each of the four children, the trustee to have authority to reinvest the income therefrom in such new investments as would be to the best interest of the beneficiaries, such investments to be approved by the settlor or his wife. There was a direction that the stock should "remain intact" and not be sold unless some emergency or contingency made a sale advisable, and then only with the consent of the beneficiaries and the settlor or his wife. Each of the children, as well as the settlor himself, was to receive 10% of the income from

the trust assets. The securities were to remain in trust for a period of 20 years, at the expiration of which time they were to be turned over without any restrictions to the four children, their heirs, executors and administrators.

It appears that the stock certificates placed in the trust were in the names of the children individually, and, being delivered to Mark H. Landis as trustee, he continued so to hold them without having them transferred to himself as trustee, so that there was nothing on their face to indicate the existence of the trust. The income received from the trust assets greatly exceeded the amounts thereof paid to the beneficiaries, and the trustee invested the surplus in a number of speculative business enterprises; he also borrowed large sums of money for this same purpose, giving stocks in the trust, both the original and those newly acquired, as collateral security therefor. In addition to loans to himself he borrowed money on individual notes of two of his sisters on the stock certificates issued in their names, but neither sister received the proceeds of such loans. Ultimately his loans at First National Bank and Trust Company in Waynesboro totaled approximately $600,000, as security for which trust assets valued at approximately $1,500,000 were deposited. His total obligations at all banks, secured by trust stocks, exceeded $1,000,000.

Many of the investments made by Mark Landis proved to be wholly worthless and others of little value. The business corporations into which he bought fell into grave financial difficulties. The situation approached a climax in the panic years of 1929 and 1930 when, for the first time, the Waynesboro Bank seems to have learned of the existence of the trust deed and that the stocks which it held as collateral for Mark Landis's loans had been improperly hypothecated by

him in excess of the powers given him in that instrument. Thereupon, at the instigation of the Bank, agreements were signed in May, 1930, by the settlor and the four children, ratifying all the sales and pledges that had been made by Mark Landis and consenting to sales and pledges that might be made thereafter by him in case contingencies arose that made such sales or pledges advisable. These agreements also empowered the trustee to establish a committee to act with him in an advisory capacity in the management of the trusts, and delegated to him and the advisors the authority to sell and pledge any or all of the trust securities with the intent or purpose of preserving or improving the value of each of the four trusts. Such a committee of five members was appointed in an agreement entered into in June, 1930; one of the appointees so named was Mark Landis himself, and three of the others were officers of the Bank.

In August, 1930, came the agreements which carried therein the germs of all the controversies here involved. They were signed by all the parties. They constituted and appointed the First National Bank and Trust Company in Waynesboro as substituted trustee with all the powers of the original trustee. They named again the same five members of the advisory committee who were to be consulted by the trustee in connection with the sale, pledge, or investment of the trust assets and provided for the filling of any vacancy in the committee that might occur. They confirmed the assets and liabilities of the trust as they then existed and authorized the trustee in its discretion to use the pledged securities to pay the indebtedness of the parties including the contingent liabilities of Mark Landis, and to sell or pledge the securities in such manner as best to further the accomplishment of the purpose of the trust. They provided that at the time of the expiration

of the trust, to wit, January 20, 1937, the assets then on hand should be distributed among the four beneficiaries in equal shares after deducting therefrom the amounts properly chargeable to each of them as set forth in a schedule thereunto attached, the distribution to be made of securities in kind as far as reasonably practicable rather than in cash. This provision evidently was intended to carry out the purpose running throughout the trust and the subsequent agreements that, as far as possible, the corporate stocks were not to be sold but were to "remain intact." An additional agreement provided an elaborate schedule of compensation for the substituted trustee.

On or about August 23, 1930, the assets of the trust were transferred to the Bank which then assumed its duties as substituted trustee and managed the trust not only until its expiration in 1937 but until the final distribution of the assets according to a stipulation of the parties in 1946. It continued during that period to make various loans to some of the individual beneficiaries on the security of their stocks. Meanwhile, on August 13, 1930, Mark Landis had assigned his beneficial interest in the trust to the remaining beneficiaries who subsequently in turn assigned their interests to Elizabeth L. Hershey, so that the latter is now the sole beneficiary. However, the term "beneficiaries" will be used herein throughout in referring to the beneficial interests under the trust whether of herself or of any or all of the settlor's children.

The settlor, Frank F. Landis, died in 1932; his wife had predeceased him in 1926.

On October 27, 1937, the trust having expired by its terms, the Bank filed its account as substituted trustee. Much litigation ensued. Various transactions of the bank as substituted trustee were attacked by the beneficiaries. After many interlocutory proceedings the

court filed an adjudication of the account and the supplemental account, and entered a final decree on April 26, 1954, imposing certain surcharges upon the Bank and refusing others. The beneficiaries on the one hand, and the Bank on the other, have taken the present appeals, objecting to decisions of the court on many of the questions involved.

It must be immediately apparent that all the present controversies between the parties stem largely if not wholly from the fact that the Bank placed itself in an undesirable, difficult, and potentially dangerous position when it accepted a trusteeship most of the assets of which were held by it as collateral for the loans it had made to the beneficiaries, and thereby assumed the role of acting in the dual capacity of trustee and principal creditor of the trust. As trustee it was under a duty to the beneficiaries to administer the trust solely in their interests, and it could not profit at their expense nor, ordinarily, assert any adverse interest in the trust property: *Commonwealth Trust Company Case*, 331 Pa. 569, 1 A. 2d 662; *Flagg Estate*, 365 Pa. 82, 73 A. 2d 411; *Steele Estate*, 377 Pa. 250, 103 A. 2d 409; Restatement, Trusts, §170. But here it must be borne in mind that the Bank's assumption of so ambivalent a position was assented to by all the beneficiaries, and in the agreements between the parties no restrictions were placed upon its rights as creditor; under such circumstances the conflict of interests engendered did not disqualify it from reasonably protecting its own interests; in order to effect such disqualification, bad faith on its part would have to be affirmatively shown: *Flagg Estate*, 365 Pa. 82, 73 A. 2d 411; *Steele Estate*, 377 Pa. 250, 258, 103 A. 2d 409, 413; *Pincus Estate*, 378 Pa. 102, 111, 105 A. 2d 82, 86.

With these principles in mind we turn to a consideration of the specific matters in controversy, giving

attention first to the complaints of the trustee.*

Republic Radiator Company.

Mark Landis was personally interested in the Republic Radiator Company of Baltimore and, while acting as trustee, invested therein by purchasing with the use of trust property, 11,944 shares of its common stock and $222,000 of its bonds; he also used a large amount of trust assets to secure notes of that Company which he had personally endorsed, his contingent liability as such endorser totaling $271,250. When the Bank became substituted trustee it made payments of a number of these notes, aggregating $152,440.64, taking merely unsecured notes of the Company in exchange. These payments were authorized by the beneficiaries. But in addition thereto the Bank made similar payments of 15 notes totaling $23,888.40 without consultation with, or approval of, the beneficiaries or Frank F. Landis, the settlor, who was then still living. No trust assets had been pledged to secure these particular notes and no benefit to the trust resulted therefrom. The court below found that at the time these payments were made the Republic Radiator Company was in financial difficulties and they were not for the best interest and benefit of the trust. The Company went into bankruptcy and nothing whatever was realized by the trust on any of the payments that had been made out of its assets. The court properly construed the agreement between the parties of August 13, 1930, as not giving any authority, either express or implied, to the substituted trustee to pay all the obligations of Mark Landis (his contingent liabilities reached the

---

* The court imposed surcharges upon the Bank as substituted trustee in respect to certain transactions with Landis Engineering & Machinery Company, Geiser Manufactring Company, the Ellicott Mortgage, and Campana Mines, but the Bank filed no exceptions to those surcharges and they are therefore not before us on appeal.

staggering total of $630,476.14) but only those for which trust securities were pledged, the whole purpose of the agreements being to salvage the trust assets as far as possible, not to provide for the payment of Mark Landis's individual creditors. Accordingly the court surcharged the substituted trustee with the amount of the unauthorized payments made by it on Republic Radiator Company obligations in the sum of $23,888.40, with interest at the rate of 2½% per annum from the dates of the payments. The surcharge is affirmed.

### Protex Chain Company.

The Bank held a note of the Protex Chain Company in the sum of $45,000 guaranteed by Mark Landis and two other persons. The latter each paid $15,000 as his share leaving $15,000 due by Mark Landis. No trust assets were pledged with the note. The Bank had advanced the sum of $9,750 to one Eader out of trust assets, and later Eader paid the Bank that amount in liquidation of his indebtedness, but the Bank, instead of replacing this money in the trust estate, applied it to the payment of the $15,000 owed it by Mark Landis on the Protex Chain Company note, and then paid itself the balance of that note, $5,250, and interest of $137.25, from trust assets. In other words, it paid to its own commercial department out of trust property a liability to it of Mark Landis which was not secured by trust assets and from the payment of which the trust received no benefit whatever. As previously stated, the court below properly held that the Bank had no authority as trustee to pay out of trust assets the personal liabilities of Mark Landis not secured by trust property. Incidentally, neither the advisory committee, nor the settlor, nor the beneficiaries, were consulted with reference to this payment of the Protex Chain Company note. Accordingly the court surcharged the Bank in the sums of $9,750, $5,250 and $137.25, or a

total of $15,137.25, with interest at the rate of 2½% per annum from the date of payment of the note. The surcharge is affirmed.

We pass to a consideration of the complaints of the beneficiaries. .

### Sales by the Bank as Pledgee.

As already stated, the Bank was a very large creditor of the trust and held as collateral trust assets pledged prior to the time it became the substituted trustee. Among such pledged assets were substantial blocks of the common stock of Landis Machine Company which had been originally placed in the trust by the settlor. In 1935 and 1936 the Bank sold an aggregate of 3,403 shares of this stock for $449,690.04 in order to reduce its loans. These shares would have constituted 17,015 shares of a new issue of the Landis Machine Company stock, which, at the date of the audit, had a value of $701,868.75, or an excess over the sale price of $252,178.71. The beneficiaries contend that the Bank should have been surcharged with that loss, together with the loss of dividends on the stock from the dates of sale to the date of audit amounting to $511,803.75, but concede the propriety of a deduction for the amount of interest on the loans which would have had to be paid had the stock not been sold. The basis of their claim is that the whole object and intent of the trust was to retain the stock securities as far as possible until the termination of the trust, that the Bank should have subordinated its technical rights as a creditor to the performance of its duties as trustee, and that there was no urgent need to sell the stock at the time; complaint is also made that neither the advisory committee nor the beneficiaries were consulted with respect to these sales. The Bank, on the other hand, points out that the sales were made at the instance of the Department of Banking in order to re-

duce the amount of the loans for which the assets were held as collateral; that the beneficiaries were notified in writing of all the sales in advance of their being made and they offered no objections; that the Bank made the sales in its commercial capacity, not as trustee; that the advisory committee, due to deaths and resignations and the refusal of the beneficiaries to approve successor appointments suggested by the Bank had ceased to function after May, 1935; and that the securities were sold at auction in Waynesboro in the manner customarily followed for the sale of stock not listed on any exchange. The court found that there was no evidence to show that the prices obtained were not fair and reasonable or that better prices could then have been secured in any other manner, that when the agreements of August, 1930, were consummated it was not contemplated by the parties that the Bank was to forfeit any of its rights as creditor, and that there was nothing to show that the Bank did not act in good faith or that it benefited by the sale of the stock other than by the payment of its loans. The court held, therefore, that the substituted trustee was not subject to surcharge on account of these sales of collateral securities made by it in its capacity as pledgee. Its ruling denying the requested surcharge is affirmed.

Florida Litigation.

One of the investments made by Mark Landis was a property in Miami Beach, Florida, and which, as the court below found, was in the trust when the substituted trustee took over the management. In 1940, three years after the trust had ended by its terms, the property was sold with the approval of the beneficiaries for $25,000. The latter, as assignees of Mark Landis's interest in the trust, demanded the proceeds of the sale, whereupon the Bank refused to convey the property. The purchaser brought action in the Florida Circuit

Court for specific performance against the substituted trustee. The beneficiaries intervened in the suit. The purchase money was paid into court. The Bank contended that the proceeds might be subject to Mark Landis's creditors on a claim that the property had been assigned by him in fraud of their rights, but the beneficiaries pointed out that although the Bank had filed its final account as trustee three years previously no creditor had appeared to make any such claim. The Florida court held that, the trust having terminated, and the property in question not being collateral for any of the obligations of the beneficiaries, they were entitled to receive the proceeds of the sale. The trustee appealed to the Supreme Court of Florida, which affirmed the ruling of the court below. The Bank reimbursed itself out of the trust assets for fees and costs expended by it in the litigation amounting to $2,870.90. The beneficiaries contended that the Bank should not be allowed such fees and expenses, but, on the contrary, should reimburse the beneficiaries for their own necessary payments of fees and costs amounting to $8,674.59, this contention being based upon the proposition that, since the trust had terminated in 1937 and, under the agreement between the parties of August 13, 1930, the distribution of the assets was to have been made in kind, as far as possible, at the time of such termination, they were entitled to have the award of the proceeds made to them in Florida and not have the money transmitted to the trustee, which had no proper claim upon it. They therefore claimed that the trustee's persistence in litigating the matter, culminating in its appeal to the Supreme Court of Florida, was wholly arbitrary and unwarranted. The court disallowed the requested surcharge, holding that the Bank had acted in good faith and that, while the trust had terminated according to its terms, it had not been wound up pend-

ing the adjudication of the accounts and final distribution thereunder; (*Thaw Estate*, 163 Pa. Superior Ct. 484, 489, 63 A. 2d 417, 420, Rest. Trusts, §344, comment a). But, whether the property had belonged to Mark Landis individually or was an asset of the trust, in either case there was no justification for the Bank contesting the claim of the beneficiaries by the extensive Florida litigation because it should have been obvious that there were no creditors who could possibly have claimed the proceeds of this property or any reason why the beneficiaries should have been denied the proceeds of its sale years after they were entitled to distribution of the trust assets, the property in question not being collateral to any of their obligations. As pointed out in *Mead v. Sherwin*, 275 Pa. 146, 156, 118 A. 731, 734, a fiduciary cannot charge the expense of a contest to the trust estate unless the estate is benefited by the proceedings; the only exception to this rule is where the trustee owes to those interested the duty of upholding the trust in the event of an attack made against it, but here there was no such attack and no such duty. The surcharge claimed by the beneficiaries of $8,674.59 and interest thereon should have been allowed, and the Bank's claim of $2,870.90 disallowed.

Interest on Cash Accumulations.

From the time the trust terminated on January 20, 1937, until April 1, 1946, the Bank was a creditor of the beneficiaries in the amount of $427,686.00 on which it was receiving interest from them at the rate of 5% per annum. During that same period it collected dividends on the securities which it held as collateral whereby it accumulated cash in the amount of $164,-008.28. Instead of using this money to pay, pro tanto, the debts of the beneficiaries, thereby saving them the interest they were paying the Bank, it deposited it in its Commercial Department where presumably it

loaned it out to its commercial customers, thus profiting for itself on both ends. The Court held that it was the duty of the Bank to apply the surplus income received by the trust to the payment of the debts instead of using it for its own profit, but that it was justified in retaining as much as $36,000 thereof for the purpose, principally, of insuring the payment of its commissions and counsel fees. Accordingly the court surcharged the Bank with interest at the rate of 5% on the accumulated cash in excess of $36,000 from the dates of the accumulations to April 1, 1946, totaling $22,304.96. The beneficiaries contend that this surcharge was insufficient in that the collateral held by the bank for its loans was ample to take care of the payment of its commissions and counsel fees. A calculation based on accumulations on hand from year to year which were available for reductions of the loans shows that the interest payments which would have been avoided had the surplus income been applied to such reductions amount to $38,769.94. The beneficiaries are entitled to recover the amount of such payments together with interest thereon from their respective dates amounting to $6,317.16, or a total of $45,087.10. The court should have made a surcharge in that sum instead of the lesser amount which it fixed.

### Interest on Loans.

The notes held by the Bank representing its loans to the beneficiaries did not specify any particular rate of interest. The trustee charged interest thereon first at the rate of 6%, later 5½%, and finally 5%, such being the customary rates charged by it to its commercial customers regardless of the adequacy of the security. In all, it received interest on its loans amounting to $433,927.81 up to 1946 when the loans were repaid. The beneficiaries contend that the rates of interest thus charged were exorbitant and that as trustee

the Bank was not entitled to make the same charge as to its ordinary commercial customers, especially because of its alleged derelictions in duty and its activities contrary to the best interests of the trust. The court pointed out, however, that the Bank was already a creditor of the beneficiaries in the amount of approximately $600,000 at the time when it became substituted trustee, that it did not increase its interest rates after that time, neither was there any evidence to indicate that the loans could have been secured at a lower rate of interest elsewhere or that the beneficiaries ever suggested a lower rate. As previously stated, the Bank did not lose its rights as creditor by assuming the trusteeship, and the agreements between the parties all assumed the propriety of the imposition by the Bank of ordinary interest charges. The court was therefore justified in rejecting the request of the beneficiaries for a surcharge based on the interest rates exacted by the Bank on its loans.

### Interest on Surcharges.

The court allowed a rate of 2½% per annum as interest on surcharges on the ground that such would be the return that a bank would probably earn on safe investments. The beneficiaries contend that this was an improper standard, partly because a bank would ordinarily obtain a greater return on most of its funds than that received from legal investments, and partly because the criterion should be the use that the beneficiaries could make of the money if paid to them when due. Be that as it may, the rate of interest to be allowed on surcharges is a subject for determination by the court under all the circumstances of the case, and we cannot say that the court abused its discretion in this instance in not allowing a higher rate.

This brings us to a consideration of matters in controversy between the parties in which both sides find

fault with the rulings of the court.

### Greencastle Bank Loan.

When the bank became the substituted trustee in 1930 some of the trust assets were hypothecated to secure loans at various banks, including the First National Bank of Greencastle. Throughout the period of its trusteeship the substitute trustee continued to carry these loans. In 1941, four years after the ending of the trust according to its terms, the beneficiaries, desiring to obtain the securities pledged for the loan, offered payment to the Greencastle Bank and requested a release of the securities. Thereupon the substituted trustee wrote to the Greencastle Bank notifying it that the collateral should not be paid to the beneficiaries but to it as trustee, in default of which the Greencastle Bank would be held responsible for any loss or damage sustained thereby. As a result the Greencastle Bank refused to deal with the beneficiaries, and, as the substituted trustee itself made no attempt to pay the loan, in 1944 it sold the collateral to the extent necessary to pay the debt. The sum realized amounted to $38,417.75, leaving, after liquidation of the loan, the sum of $383.72 in cash which was delivered to the substituted trustee together with the remaining unsold collateral. The trustee had given no notice to the beneficiaries of the proposed sale so that they could protect their interests nor did it itself take any action to assure itself that a proper sum would be realized. The principal stock sold was common and preferred stock of the Landis Machine Company which, at the time of the audit, had a value of $15,733.50 in excess of the price realized by the sale. The same considerations apply in this instance as were discussed in the case of the Florida property. The trust had terminated many years before and the beneficiaries were clearly entitled to pay the Greencastle Bank loan and

thereby secure the collateral which had been pledged therefor; the Bank had no right to interfere and had no proper claim of its own to the possession of the stock. The whole tenor and purpose of the trust and of the agreements between the parties was to retain the stocks intact in the absence of an emergency, which here did not exist. The court held, therefore, that the substituted trustee should be surcharged for the difference between the price realized from the sale and the value of the stock at the time of the audit, to wit $15,733.50. However, in its final adjudication it reduced that amount because of the fact that, by a stipulation of the parties of March 30, 1946 (February 25?) it was agreed that the cash accumulated at that time was to be used to pay the then existing indebtedness to the Bank, and, upon its receiving the sum of $263,-768, it was to surrender to the beneficiaries all the assets in its hands (reserving a portion of the stock as security for payment of its commissions and counsel fees). From this the court concluded that the stock pledged with the Greencastle Bank, even if redeemed by the trustee in 1941, would probably have had to be sold in 1946 in order to help raise the required sum of $263,768. It therefore reduced the surcharge it had originally imposed to $6,738.20, an amount determined by taking the value of the stock as of April 1, 1946, when it was lower than at the time of the audit. We are not in accord with this conclusion for two reasons: (1) because it had been the purpose of the beneficiaries to pay off the Greencastle Bank loan in 1941 with their own funds, and (2) because the other trust loans were all paid off and the collateral freed in 1946 without requiring the stock in question for that purpose; indeed it would not then have been available in any event since it had already been sold by the Greencastle Bank in 1944. The proper amount of the sur-

charge should have been that originally fixed by the court, $15,733.50, plus the dividends, $14,250, on the stock which were lost in the period between the time of the sale of the stock by the Greencastle Bank and the date of the audit, or a total of $29,983.50. The beneficiaries made an additional claim of $5,308.04, as the amount of interest unnecessarily paid to the Greencastle Bank after the time of the substituted trustee's interference with the attempt of the beneficiaries to redeem the stock, but this fails to take into account the fact that the beneficiaries would have lost an equivalent amount of interest on the money they would have used to redeem the stock, and therefore such interest claim cannot be allowed. The Bank contends that no surcharge at all should have been imposed because it would not have had any cash in its hands to have redeemed the stock either in 1941 or 1944 unless diverted from other purposes, but this argument loses sight of the fact that, as previously stated, the beneficiaries intended to pay off the Greencastle Bank loan with their own money, not that of the trust.

Shippensburg Bank Loan.

The history of the loan of the First National Bank of Shippensburg is the same as that of the Greencastle Bank loan above discussed, and all that has been said in the latter case applies equally to it. The Shippensburg Bank held common stock of the Landis Machine Company as collateral security. In 1941 the beneficiaries desired to pay off the loan in order to redeem this stock but the substituted trustee wrote to the Shippensburg Bank warning it against delivering the collateral to the beneficiaries. The result was that in 1944 the Shippensburg Bank sold the stock, realizing $34,320. After deducting the amount due a balance of $11,132.86 in cash and the surplus collateral were delivered to the substituted trustee. In its original ad-

judication the court imposed a surcharge on the Bank in connection with this transaction of $24,667.50, representing the difference between the price realized from the sale and the value of the stock at the time of the audit. In its final adjudication, however, the court reduced the surcharge for the same reason as in the Greencastle Bank case to $15,028.05. The proper surcharge, as in the Greencastle Bank matter, is the diminution in the value of the Landis Machine Company stock from the time of the sale in 1944 to the date of the audit, to wit $24,667.50, plus the dividends lost during that period amounting to $20,735, or a total of $45,402.50. The claim by the beneficiaries of interest in the amount of $3,796.44 is disallowed for the reason stated in connection with the Greencastle Bank loan.

### Commissions.

By the agreement of the parties of August 27, 1930, it was provided that the substituted trustee could make an annual charge of commissions of ¼ of 1 percent of the value of the trust estate including bonds, stock, real estate and all other assets, the minimum fee to be not less than $5,000 plus expenses. At the termination of the trust it was to receive additional compensation based upon the securities then in its hands: upon the first $100,000 nothing, upon the second $100,000 5%; for each $100,000 thereafter the rate of compensation to be increased 1% above the rate charged for the next lower sum of $100,000.

From 1930 on, when it entered upon the trust, the the substituted trustee paid itself annual commissions aggregating $77,904. The present controversy concerns its claim for the terminal commission. The beneficiaries contend that it is not entitled to any commissions at all, pointing to the decisions in *Kline's Estate*, 280 Pa. Pa. 41, 49, 124 A. 280, 283, that compensation for services to the trust should not be allowed to a trustee ad-

judged guilty of supine negligence; in *Weinstein v. Union Trust Company of Pittsburgh,* 313 Pa. 280, 284, 169 A. 101, 102, that a trustee forfeits his right to compensation if surcharged for loss to the trust estate caused by his faithlessness and mismanagement; in *Commonwealth Trust Company Case,* 331 Pa. 569, 582, 1 A. 2d 662, 668, that a trustee should not be allowed compensation if he has failed in many instances properly to perform its fiduciary duties; and in *Lewis Estate,* 349 Pa. 455, 461, 462, 37 A. 2d 559, 562, 563, that a trustee guilty of gross irregularities in investments and negligence in administration of the trust is not entitled to any commissions. The beneficiaries urge that the derelictions of the substituted trustee were such as, under the rulings of those authorities, to disentitle it to compensation, pointing out the surcharges that have been made against it; they claim that it administered the trust primarily for its own benefit and only cursorily for the benefit of the cestui qui trustents. The court, however, found that the Bank as trustee had not been guilty of any fraud or bad faith in its management of the trust, but only of the mistakes, errors of judgment, and misinterpretations of the agreements for which it was surcharged. Accordingly the court held that it was entitled to the commissions provided for in the agreement. While there is undoubtedly much to be said for the contention of the beneficiaries that the attitude of the Bank throughout was one of concern for its own interests rather than for those of the beneficiaries, and that it favored itself whenever those interests came into conflict, we are not prepared to overrule the court's exercise of its discretion in allowing the commissions. The beneficiaries claim that in any event the Bank should not have been allowed annual commissions after the trust ended by its terms in 1937, but the duties and powers of the substituted trus-

tee did not immediately cease at that time but continued to the extent appropriate until it finally accounted and conveyed the trust property to those entitled (Scott on Trusts, vol. 3, p. 1889, sec. 344; Rest. Trusts, §344, comment a.). Therefore it was justified in charging the annual commissions until the year 1946 when final distribution of the trust assets was effected.

The question arises as to the proper amount to be awarded to the trustee as the terminal commission. It will be noted that, according to the provisions of the August 27, 1930, agreement, the annual commissions were to be allowed on the basis of the "bonds, stock, real estate and all other assets of the trust," whereas the terminal commission was to be limited to the "securities" then in its hands. The court held (1) that the commission could not be calculated on the gross value of the securities belonging to the trust at that time but that there must be deducted the amount of the loans against which the securities were pledged; (2) that the accumulated cash of $164,008.28 was not a "security" within the meaning of the agreement, and, moreover, the trustee had already collected commissions on practically all of that amount as income; (3) that the real estate was not such a "security"; and (4) that the substituted trustee was not entitled to any commissions on the equity in the collateral which secured the loan of the Citizens National Bank because that security, when released, did not come into the trustee's hands. The court found that the total value of the securities turned over by the trustee to the beneficiaries on March 30, 1946, amounted to $180,488.22, in addition to which it retained, temporarily, securities of the value of $130,000, or a total of $310,488.22, on which the commissions, calculated according to the provisions of the agreement, amounted to $11,734.17, and accordingly the court allowed that amount to the

trustee. We find no error in that allowance, and it is affirmed.

### Counsel Fees.

Counsel for the substituted trustee received as part payment for their services approximately $9,000, and, at the audit, the Bank asked for an additional allowance for counsel fees of $35,000. The court, after carefully reviewing the services which counsel had rendered to the trust, made an allowance of $30,000. The beneficiaries do not object to that amount but contend that the fees should be paid by the trustee out of its own funds and not out of the trust property for the same reasons urged by them in regard to the trustee's commissions, namely, that it was disentitled because of its maladministration of the trust. Without repeating the previous discussion concerning the right of the trustee to commissions, we are of opinion that the allowance of the additional counsel fees was proper, and it is affirmed.

The record is remanded to the court below with direction to enter a final decree in accordance with this opinion; the parties to bear their own respective costs.