**Bennet Estate**

596

*Charles H. Miner, Arthur A. Silverblatt, Jonathan C. Valentine* and *James A. Shea,* for substituted trustees.

*Anne X. Alpern,* Attorney General; *Ralph S. Snyder,* Deputy Attorney General, and *Henry H. Thalenfeld,* Special Assistant Attorney General.

*William A. Valentine,* guardian and trustee ad litem, for beneficiaries.

SELECKY, P. J., March 5, 1959.—This matter came before the court upon a petition for adjudication by the substituted trustees, Gilbert S. McClintock, Esq., Paul Bedford, Esq., and Samuel W. Rhoads (who has since died), of a trust established under item twentieth of the will of Martha Bennet, who died June 26, 1903. This court, by the Hon. Arthur A. Maguire, then presiding, appointed Charles A. Shea, Esq., master to examine the many accounts and voluminous papers filed in this estate "and to report his findings of fact, conclusions of law and recommendations to this court," and appointed William A. Valentine, Esq., guardian and trustee ad litem for "poor little children" for whom the following trust was created in item twentieth of the will of Martha Bennet:

"Twentieth: I give all the rest, residue and remainder of my estate to my executors, *In Trust*, to found in the City of Wilkes-Barre, Pa., a home for poor little children, to purchase land to erect thereon a building suitable for that purpose and to furnish the same and to maintain it as a public charity to the extent which my estate will admit."

Because this trust has been in existence over 50 years, the files are extensive. Any attempt to enumerate all the proceedings taken heretofore would tend only to confuse the single issue presented to the court at this time, which is whether the substituted trustees administered said trust in accordance with item twentieth of the will of Martha Bennet and in compliance with the opinion and decree of this court dated November 24, 1933, which was reaffirmed by another order dated January 29, 1937, hereinafter quoted. The petition for adjudication, filed by the substituted trustees after filing their seventh and partial account on July 7, 1957, seeks a finding of such compliance. William A. Valentine, Esq., the guardian and trustee ad litem for "poor little children" urges, in a very able brief, a

finding of noncompliance, with the attendant penalty of surcharge.

The master, Charles A. Shea, Esq., in a comprehensive report to this court, prepared after conferences with this court and the Attorney General's office, and after taking testimony of the substituted trustees, analyzed the extended proceedings in this estate and concluded that the substituted trustees deviated from the terms of the trust and did not comply with the order of this court dated November 24, 1933, which was reaffirmed by another order dated January 29, 1937, but, instead, assigned said funds to another purpose, namely, to the Children's Service Center of Wyoming Valley to provide psychiatric treatment for children with behavior problems, with some accompanying residence accomodations.

The master reported, on the other hand, that the trustees kept the court informed, not by using the audit procedure, or such, but by informal oral and written reports, of the uses to which the substituted trustees were committing the income and principal of the trust, that the trustees did put the funds to such other uses in good faith, and that the Attorney General's office is not pressing for any surcharge because of the good faith of the substituted trustees. The master recommended that all seven partial accounts be confirmed absolutely (the previous confirmations being void, because the Attorney General was not given any notice of said proceedings) and that the balance remaining in the trust be returned to the substituted trustees for further administration, subject to their immediate application to this court to invoke the cy pres doctrine to sustain their present assignment of the trust funds, if possible.

Briefly summarizing the proceedings in this case, at the audit of the third and partial account of F. W. Wheaton, Esq., the original trustee, in 1933, it ap-

peared that the original trust fund of $277,168.23 had finally increased to the sum of $681,302.41, with further funds to be added upon the death of certain life tenants of other trusts. It was then, on May 18, 1933, that a petition was filed by 12 outstanding citizens of the City of Wilkes-Barre, joined in by the Hon. William A. Schnader, the Attorney General of the Commonwealth of Pennsylvania, who consented thereto, praying the court to permit petitioners to intervene for the purpose of requesting the court to invoke the cy pres doctrine, to which petition the trustee filed an answer generally agreeing thereto. The petition alleged that the need for "a home for poor little children" was then being adequately met by existing charitable institutions, principally the St. Stanislaus Institute, Sheatown, Nanticoke, Pa., the Children's Home of Wilkes-Barre, Pa., and the United Charities Home of Hazleton, Pa. After hearing considerable testimony on this petition, in connection with the audit of the third and partial account of F. W. Wheaton, Esq., trustee, this court, through the Hon. E. Foster Heller, now deceased, found the following facts, in the opinion filed November 24, 1933 (the numbering of findings is ours) :

1. ". . . we find that the institutional care is necessary prior to the placing of a child in a foster home, regardless as to which is ultimately the best method of taking care of the same. However, this question, so far as the testatrix is concerned, was decided at the time of the making of her Will, and it was her thought, her purpose, her intention, that institutional care was the care most needed, and we cannot at this time make another will for her. . . ."

2. "There is nothing in the direction of the testatrix which is contrary to public policy, and the law of Pennsylvania has always favored bequests for charitable purposes, and has put forth every effort to carry

out the intention of the testator or testatrix and not have the bequest fail."

3. "What we are really asked to do by the petitioner, is to rewrite the 20th section of the testatrix's Will, and this we are not prepared to do. The clause is definite and certain, the objections of the direction, as set forth in the clause, still exists, and the fund now in the hands of the trustee is adequate for the carrying out of the intention of the testatrix."

The court thereupon entered the following order:

"We therefore deny the prayer of the petition of the intervenors and award the balance, shown by the account to the Trustee for the uses and purposes of the Will."

About three months thereafter, on Feburary 23, 1934, a petition for reargument was requested and, on July 27, 1934, the Children's Home of Wilkes-Barre, upon petition signed by Paul Bedford, Esq., as president, and Gilbert S. McClintock, Esq., as acting secretary and treasurer, was permitted to intervene in said reargument. On January 29, 1937, after taking some additional testimony, the petition of the Children's Home of Wilkes-Barre to intervene was denied, the second request to award the funds cy pres was refused, and the previous order of November 24, 1933, above quoted. was reaffirmed, all this in clear, concise language.

Just six days thereafter, on February 4, 1937, F. W. Wheaton, Esq., trustee of the Martha Bennet trust, died and, on April 19, 1937, the court appointed as substituted trustees Gilbert S. McClintock, Esq., and Paul Bedford., although they were then officers of the same Children's Home of Wilkes-Barre, which was refused permission to intervene for cy pres purposes, along with Samuel W. Rhoads, subject to the following specific instructions:

". . . with the direction that said Trustees proceed forthwith to execute said Trust according to the conditions, uses and Trusts contained in the will of said decedent and further to file a first report or account with the court at the expiration of six months from the date thereof, and annually thereafter . . ."

As pointed out by William A. Valentine, Esq., the guardian and trustee ad litem for "poor little children," the substituted trustees, instead of carrying out the very plain dictate of this court, enunciated in its orders above referred to, asked others (not the court) for ". . . advice as to who would be the best person to come into the community and make a report on the social needs and best program to back for children's work in the Wyoming Valley and surrounding territory . . . ," as testified by Gilbert S. McClintock, Esq., a substituted trustee, before the master, Charles A. Shea, Esq., on April 23, 1958. The substituted trustees thereupon retained the services of one Paul T. Beiser, then general secretary of the Henry Watson Children's Aid Society of Baltimore, to survey the needs in Wilkes-Barre and vicinity. He reported these findings to the substituted trustees:

"For the dependent child who has no home and the neglected child who must be removed from his home, there is reasonable provision of a fair quality of care by the cooperation of the private agencies with the public officials.

"The group of children for which the great need for service exists is those whose special medical problem or behavior problem calls for more specialized intensive service . . .

"What the community needs most is a well-rounded, flexible children's service for preventative action at earlier stages in children's problems . . . basing its treatment on skilled diagnostic service, the findings

of a psychiatrist, a psychologist, and a pediatrician, and having as outlets for its service a boarding home and institutional program to meet individual needs . . .

"It is recommended that the Martha Bennet Fund be used as the leverage to bring together the agencies (the Childrens Home and the United Charities) and supplement their resources to secure such a program."

Thus, the specific benevolent wishes of testatrix, Martha Bennet, to establish a "home for poor little children" were relegated to the rather minor role of becoming a "leverage" to bring together other agencies for a new program. In a partial attempt to comply with the terms of this trust, the substituted trustees did, however, arrange to purchase land from the Children's Home of Wilkes-Barre and to erect thereon a separate brick cottage having a capacity of 15 to 18 children, and did expend funds for furnishing the cottage and the administration building, which the trustees are carrying in their account at the value of $148,911.96.

The trustees, in an informal procedure, filed a copy of this report of Paul T. Beiser, and apparently discussed it with the late Judge Heller, according to their testimony, on December 15, 1937. Thereafter, the substituted trustees filed their first and partial account, which was confirmed absolutely and audited by the late Judge Heller on May 8, 1940, and which showed the expenditures of some funds for the brick cottage and administration building, above referred to.

On May 17, 1944, said substituted trustees filed another written report with the clerk of the orphans' court to the effect that the foster home program had been abandoned and that the main objective of the trust was now "the maintenance and direction of the cottages for poor children of this city and valley who are in need of a study and treatment for behavior

problems," which report the substituted trustees testified they brought to the attention of the Hon. Andrew Hourigan, then presiding and since deceased. Although a copy of the informal report, alleged to have been filed May 17, 1944, is attached to the petition for the adjudication of the seventh and partial account in 1957, the original report does not appear in the files nor does any record of it appear on the docket entries. From this time on, the funds of the Martha Bennet trust were used to provide such psychiatric treatment for problem children through the Children's Service Center, which had been incorporated in March of 1938, as suggested by the report of Paul T. Beiser, above referred to. This court is well aware of the excellent services being rendered not only children but adults in the Wyoming Valley area by the Children's Service Center. We are also cognizant of the tremendous time and effort which Gilbert S. McClintock, Esq., and Paul Bedford, Esq., the substituted trustees, have given to better our community. Our difficult problem, however, is to determine whether those services were the ones envisioned by Martha Bennet as she recited them in her will; if not, those chosen by her to be rendered through the use of her funds must prevail.

Seven partial accounts were filed, but it was only when a petition for adjudication was filed with the seventh and partial account that this problem of the use of these funds came formally before the orphans' court, at which time the Attorney General's office was, for the first time, properly notified and brought into the case (the petition for adjudication filed with the first and partial account merely requested a revaluation of the assets).

The guardian and trustee ad litem for "poor little children," William A. Valentine, Esq., aptly pointed out in his brief that the Rock of Gibraltar in the law

of trusts is the plenary authority in the orphans' court, as a court of chancery, to control trusts, to which all trustees are subject. Wilson v. Board of Directors of City Trusts, 324 Pa. 545 (1936), states it, at page 550, thus:

"The scope of the powers that may be exercised by that court [orphans' court] in relation to the administration, management and control of the trust property is ample for all purposes. It has been held that testamentary trustees are officers of the court (Laverelle's Estate, 101 Pa. Superior Ct. 448) and it is only right and proper that they should be subject to the control of the court to which they must account, which may surcharge them for dereliction in office and determine whether such dereliction has taken place. In the exercise of this power particularly where 'charitable uses or bequests are involved, it [the orphans' court] has [the] broad visitorial and supervisory powers of the Commonwealth': Toner's Estate, 260 Pa. 49. . . . In Lafferty v. Corcoran, 180 Pa. 309, this court said, with reference to the power of the orphans' court to compel an accounting by a trustee, 'The orphans' court has ample power to afford all needed relief in the premises. Its authority is plenary, embracing as it does all the powers of a court of chancery.' And, in Shollenberger's Appeal, 21 Pa. 337, the court said: '. . . within its appointed orbit its jurisdiction is exclusive, and therefore necessarily as extensive as the demands of justice.' "

The pole star for the court and the trustees in this matter is item twentieth of the will of Martha Bennet which reads as follows:

"Twentieth: I give all the rest, residue and remainder of my estate to my executors, *In Trust*, to found in the City of Wilkes-Barre, Pa., a home for poor little children, to purchase land to erect thereon

a building suitable for that purpose and to furnish the same and to maintain it as a public charity to the extent which my estate will admit."

Martha Bennet specifically directed that her trust res should be maintained as "a public charity" so that the trustees are obligated to give notice of all proceedings, the filing of the accounts, petitions for adjudication, and the like, to the Attorney General, who represents the public and the beneficiaries of such a public charitable trust, as an indispensable party, as was recently restated in Pruner Estate, 390 Pa. 529 (1957), at page 531, as follows:

"The beneficiary of charitable trusts is the general public to whom the social and economic advantages of the trusts accrue. But because the public is the object of the settlors' benefactions, private parties have insufficient financial interest in charitable trusts to oversee their enforcement. Consequently, the Commonwealth itself must perform this function if charitable trusts are to be properly supervised. The responsibility for public supervision traditionally has been delegated to the attorney general to be performed as an exercise of his parens patriae powers."

See also Garrison Estate, 391 Pa. 234 (1958).

Unfortunately, the Attorney General was not notified of the filing of any of these seven partial accounts by the substituted trustees, so that there was no one in court to enforce the provisions of the trust for the "poor little children," the beneficiaries of the charity of Martha Bennet. Since this indispensable party, the Attorney General, was absent, it is clear from the outset that the confirmations absolute of the seven partial accounts must be and they are hereby rescinded.

The original trustee, F. W. Wheaton, Esq., now deceased, likewise gave no notice to the Attorney General of the filing of his three partial accounts. Since

said F. W. Wheaton, as trustee, had to wait for other trusts to terminate before their remainders might be added to the Martha Bennet trust, he merely accumulated the income and augmented the trust, so that there appears to be no purpose in voiding the confirmations and audits of Wheaton's accounts, which are allowed to stand.

The failure of the substituted trustees to press for an audit of the accounts after the first and partial account and for a formal approval of any proposed distribution led to the present situation, and again emphasizes the necessity of trustees preforming their duty of administering a trust under the supervision of the orphans' court in a formal manner. The orphans' court can exercise its plenary powers over the administration, management and control of trust property only when trustees submit reports of their administration formally to the court for examination and audit, as provided in section 983(3) of the Fiduciaries Act of April 18, 1949, P. L. 512, 20 PS §320.983(3), and as provided by similar sections in the Fiduciaries Act of June 17, 1917, P. L. 447. No trustee can protect himself by informality, by informal oral conferences or by filing informal reports which may or may not be brought to the attention of the orphans' court judge.

The Fiduciaries Acts of 1917, sec. 46(h), 20 PS §838, and sec. 47(b), 20 PS §841, and of 1949, section 983, cited supra) both provide procedures which trustees may use to seek the court's approval of, or comments on, their administration of trust funds. Unless trustees direct the court's attention to these problems properly in the statement of proposed distribution or petition for adjudication, they cannot expect any protective confirmation of the account nor approval of the proposed distribution. This was very recently pointed out in Johnson Estate, (Philadelphia County) thus:

"The Pennsylvania Company, as trustee, filed its first account in 1944. The fact that the art collection was being temporarily lodged at the Art Museum *was set forth in the petition for distribution, but the court was not asked to make any decision with respect thereto.* Accordingly, on November 22, 1944, the late President Judge Van Dusen, *who audited the account, permitted it to be confirmed without making any comment concerning the location of the collection*": Johnson Estate, 15 D. & C. 2d 407, at 417 (1958). (Italics supplied.)

That court further stated that only when the auditing judge "was informed that the parties wished to have the whole situation reviewed" was the court able to do so definitively: Johnson Estate, 15 D. & C. 2d 407, at 418. The grave responsibilities placed upon trustees impel the use of the statutory procedures set up for their protection, not informal reports nor discussions. The substituted trustees' first and partial account was audited on May 8, 1940, but the petition for distribution did not ask for a ruling on whether the funds were being administered properly; it merely requested a revaluation of the assets. Hence, this court was not requested to pass upon that most important matter, whether the trustees were, in fact, complying with testatrix' will and the order of this court dated November 24, 1933. Then, no audit was requested of, nor any petition for adjudication filed with, the subsequent accounts, numbered two to six, until the matter was finally brought to this court's attention by a petition for adjudication filed with the seventh and partial account in 1957.

We emphasize that trustees must follow these statutory procedures, or others, such as petitions for declaratory judgment, in order to get protective decrees from this court. It is for that reason that our

new court rules strictly prohibit the register of wills and the clerk of the orphans' court from accepting fiduciaries' accounts unless they are accompanied by petitions for distribution or adjudication and the other accompanying statements, which must, in the proper sections, bring to the attention of the court those matters upon which the trustees want the court to comment, or the particular use of the funds which must be adjudicated. All this, of course, presumes notice to the Attorney General who is an indispensable party in all stages of any proceedings involving public charitable trusts.

It is a fundamental principle that trustees dare not risk any attempt to deviate from the clear purposes of a trust without formal, nor merely the informal, approval of the orphans' court. If such formal written approval is not forthcoming, the trustees cannot proceed with such deviation without incurring the well known risk of surcharge. The right to allow deviation from the terms of a trust because of changes in circumstances, or the like, lies in the orphans' court, not in the trustees; their deviation, if any, is at their own risk: 2A Bogert, Trusts and Trustees, §435, p. 339; 4 Scott on Trusts, §399, at page 2827; Hartje's Estate, 345 Pa. 570 (1947) ; A. L. I. Restatement of the Law of Trusts 2d, §186 and §167, and the comments thereon.

It would appear to this court that the substituted trustees allowed themselves to deviate from the original terms of the Martha Bennet will because of their belief that if a charitable trust is set up for the same charitable purpose as that already being carried out by some governmental agency, with the use of tax moneys, then the charitable trust fails and the cy pres doctrine should be invoked. This attitude flies in the face of the very favored position of exemption from taxation given to charitable trusts by law because

charitable trusts perform some public function which a governmental body should perform, and because deducting money from the charitable trust for tax purposes, which would then be applied to the same or some other charitable use, would only result in a waste of funds because the process of collecting taxes is costly and would shrink the amount available for the charitable purpose. This principle is stated thus by Edith L. Fisch, in her article on "Judicial Attitude Towards the Application of the Cy Pres Doctrine," found in 25 Temple Univ. Law Quarterly 177, at page 183 (1951):

"The theory underlying tax exemption of property donated and used for charitable purposes, is that a public service is performed by relieving the state from the burden of supporting certain activities which its duty to its citizens would otherwise impose upon it. . . . The House Ways and Means Committee Report on the Revenue Bill of 1938 contained the following observation regarding the social policy of tax exemption:

" 'The exemption from taxation of money or property devoted to charitable and other purposes is based upon the theory that the Government is compensated for the loss of revenue by its relief from financial burdens which would otherwise have to be met by appropriations from public funds, and by the benefits resulting from the promotion of the general welfare.' "

(See article IX, sec. 1 of the Pennsylvania Constitution for authority given the General Assembly to exempt from taxation "institutions of purely public charity," and cases cited thereunder in Purdon's Statutes).

It does not follow that, if tax moneys are being used for a certain public purposes, any trust established for the same charitable purpose must fail as being

impracticable or unnecessary. In fact, that is generally the purpose of a charitable trust, to alleviate the heavy burden of taxation, and it is for that reason that charitable trusts are favored by tax exemption and the generosity of settlors of such trusts is thus encouraged. If the trustees find that the same charitable purpose is being accomplished by tax funds, it is the duty of the trustees to relieve the taxpayers of said burden, not to invoke the cy pres doctrine to apply these trust funds for other purposes. That was the avowed intention of Martha Bennet in her will, to relieve the taxpayers of such burdens as pertains to "poor little children." This court indicated so in its opinion and order of November 24, 1933.

In the instant case, the substituted trustees and the intervenors had contended that there was no need for a home for "poor little children" because of the existence of certain other charitable institutions in Luzerne County, namely, the St. Stanislaus Institute at Sheatown, Nanticoke, Pa., the Children's Home of Wilkes-Barre, Pa., and the United Charities Home of Hazleton, Pa.. and they contended further that more modern social service principles dictated that it was better and cheaper for children to be placed in foster homes. When the Luzerne County Institution District was established by law in 1937 and undertook to use tax moneys for the placement of children in foster homes, the substituted trustees wrongly concluded that they need not carry out the terms of this trust by establishing a home for "poor little children," or even committing said funds to payment for children in foster homes, because this purpose was being accomplished by the Luzerne County Institution District from tax funds.

Testatrix, Martha Bennet, was aware of the existence of the Home for Friendless Children of Wilkes-

Barre (later the Children's Home) and its function in caring for children because, in item fifth of her will, she bequeathed the principal of an. $8,000 trust to said "Home for Friendless Children," upon the death of Mary C. Buckley, life tenant. She likewise bequeathed a portion of the remainder of another trust, subject to the life estate in her sister, Sadie Bennet, to the same Home for Friendless Children. Despite this, she bequeathed the very substantial residue of her estate, in item twentieth of her will, to found a "home for poor little children." These substituted trustees may disagree with the views expressed by Martha Bennet in her will as to the need for such an additional home for "poor little children" or even its social worth in the better rearing of children, but this court, in its decision of November 24, 1933, indicated it was Martha Bennet's right to dispose of her estate in any lawful manner she chose: Girard Will Case, 386 Pa. 548 (1956). In 1958, the Luzerne County Institution District expended, as the public records reveal, the sum of $181,440.35 for poor little children assigned to the three children's institutions in Luzerne County, mentioned above, the further sum of $150,036.15 for poor little children in foster homes, and additional sums for clothing and medical and dental care, etc., for a total of $381,303.91. The institution district received from sources other than tax funds, such as Social Security, payments from parents, State appropriation, etc., the sum of $132,828.88, and thus had to collect from the taxpayers the balance needed for poor little children, the sum of $248,475.43. When we view this tremendous tax burden imposed upon the taxpayers by the Luzerne County Institution District for the care of "poor little children," it seems to this court that Martha Bennet chose well in disposing of her property, as she did, with its intended reduction of this burden on the taxpayers.

The guardian and trustee ad litem for "poor little children," namely, William A. Valentine, Esq., raised three important matters to be considered: Conflict of interest, intentional deviation of funds and delegation of powers or discretion by the substituted trustees. He pressed the point that there was a conflict of interest between these subsituted trustees as such, and themselves in another capacity, as officers of the Children's Home of Wilkes-Barre, which, originally, was performing a similar function for "poor little children," but which later, apparently, changed its program, first to that mainly of foster home care and later to psychiatric treatment for children with behavior problems, and thus these trustees tended to assign the Martha Bennet trust funds to the same uses. See Commonwealth Trust Co. Case, 331 Pa. 569 (1938), at 575; Quell v. Boyajian, 90 Pa. Superior Ct. 386 (1927), at 389. He contended that these deviations by the substituted trustees from the original terms of the trust were intentional and contrary to the clear order of this court for which a surcharge should be levied. Said trustee ad litem further argued that the trustees, in effect, unlawfully delegated their powers and discretion to others when they allowed the commingling of these trust funds with other funds in the conduct of the new Children's Service Center, where these three substituted trustees became only three of 21 directors who directed the use of the commingled funds for said duties. See section 941 of the Fiduciaries Act 1949, 20 PS §320.941; Bohlen's Estate, 75 Pa. 304 (1874); A. L. I. Restatement of the Law of Trusts § 171 and §379.

Unfortunately, this court in 1937 unwittingly created the very situation that may have allowed a conflict of interest when the late Judge Heller appointed as substituted trustees two persons who were trus-

tees and officers of the Children's Home, which tended to develop conflicting purposes and who, prior to their appointment, were themselves attempting to invoke the cy pres doctrine in this estate. This should have been a sufficient signal of possible conflict of interest to the court. Further, this court's apparent acceptance of informal oral and written reports, including a visit by a judge to the Children's Service Center to view the work prior to 1956, according to the testimony of the substituted trustees, apparently led the substituted trustees to believe they were acting "with the blessings of this court" from 1937 to 1957, as they testified.

This court learned, in a conference held March 4, 1958, which was attended by the substituted trustees and their counsel, the master in this case, the guardian and trustee ad litem for "poor little children," Deputy Attorney General Ralph S. Snyder, representing the Attorney General's office, and his local associate, Henry H. Thalenfeld, Esq., that the Attorney General would not object to a proper confirmation of the seven partial accounts filed to date, nor to the conclusion that no surcharge should be levied against these substituted trustees because of the fact that the substituted trustees did keep the court informed, although informally, throughout these many years and because of their good faith.

The master and attorneys for the substituted trustees have quoted the case of Attorney General v. Old South Society in Boston, 13 Allen 474 (Mass. Reports, 1866), in support of the position that the good faith of the substituted trustees should be considered by this court, as a court of equity (Lonergan's Estate, 303 Pa. 142 (1931), at page 147) to do justice to all, despite the fact that this deviation of funds has gone on for some 20 years. In the Massachusetts case, cited supra, the court stated, at page 491;

... "The mingling of the fund for the poor with the other fund of the church did not entitle the poor to the whole of the church fund. This is not the case of an individual mingling his own private moneys undistinguishably with funds held by him in trust . . ." (The court directed that the trust funds be separated.)

At page 495, the court stated further:

"The length of time for which a court of chancery will require the trustees of a charity to account for income which has not been applied according to the intentions of the donors is much affected by the particular circumstances of each case. An arrangement made in good faith and acted upon for many years will not be lightly disturbed." Cited in 4 Scott on Trusts, §386, at page 2747. Cf. A. L. I. Restatement of the Law of Trusts §201 and comment (a).

Hence, because of the good faith of the substituted trustees displayed in their administration of these trust funds in that they apparently kept the court informed, informally at least, of their plans throughout these many years, although they neither asked for formal adjudication of their accounts nor notified the Attorney General of the filing thereof, and because the Attorney General has not filed any objections to said accounts, now that he is a party to these proceedings and does not press for any surcharge, this court will confirm said seven partial accounts absolutely and make a report on audit shortly.

This opinion, however, must not be considered as an indication of the atttude of this court nor of the Attorney General as to the future use of the funds of the Martha Bennet trust. In fact, this court will naturally require notice to the Attorney General of all proceedings hereafter; it will require full disclosure of the interest of the substituted trustees in any other trusts or charitable organizations with the view

to prohibit any possible conflict of interest which may lead to disqualification; it will carefully scrutinize any procedure that may lead to improper commingling of income from this trust with other income or funds; it will look askance at any delegation of discretion by the trustees or any jointure with others or with a board of directors which will relegate these trustees to a small minority voice in the use of said funds; it will require strict compliance with the statutes and rules which make it incumbent upon trustees to bring to the attention of this court any legal problems upon which the court is to pass. It is with these caveats in mind, and with the greatest respect and admiration for the excellent work being accomplished by the staff of the Children's Service Center of Wyoming Valley, that this court reluctantly confirms the seven partial accounts and returns the trust res to the substituted trustees for further administration in accordance with this

### *Decree*

The court hereby decrees as follows:

1. That the previous confirmation absolutely of the seven partial accounts filed by the substituted trustees, namely, Gilbert S. McClintock, Paul Bedford and Samuel W. Rhoads (who died since the filing of the seventh account, and whose vacancy was filled by the appointment of Guthrie Conyngham on December 20, 1957), are hereby set aside because of the complete failure of notice to and participation therein by the Attorney General, an indispensable party.

2. That said seven partial accounts are now hereby confirmed absolutely, since the Attorney General has been properly notified and has filed no objections to said accounts nor requested any surcharge, for the reasons set forth in the opinion above, and a report on the audit thereof will follow shortly.

616

·3. That the substituted trustees are hereby directed to immediately file an application to this court, under the proper statute, requesting this court to invoke the cy pres doctrine, after giving notice to the Attorney General, to determine whether this court will award the trust income or principal, or any part thereof, to the Children's Service Center of Wyoming Valley for the purpose of providing psychiatric treatment for children with behavior problems, failing which, the substituted trustees will carry out their duties in conformity with item twentieth of the will of Martha Bennet, deceased, and with the previous orders of this court, as they may be amended by this court after proper petition and hearing.

4. That the master, Charles A. Shea, Esq., and the guardian and trustee ad litem for "poor little children," namely, William A. Valentine, Esq., are hereby discharged from further duties, with directions to submit their bills for services rendered and expenditures incurred to the substituted trustees, who may ask for allowance thereof from the trust in the report of audit to follow shortly.