## Curtis Trust

*Cuthbert H. Latta*, for exceptant.

*W. H. Lathrop*, contra.

*George D. Parrish*, p.p., guardian and trustee ad litem.

SHOYER, J., July 24, 1968.—This trust arises under the deed of trust dated November 17, 1937, a copy of which is hereto annexed, whereby Melville G. Curtis, settlor, transferred his therein itemized assets to

Maurice W. Sloan and Girard Trust Company, trustees, in trust, to pay the net income to his wife, Emma Warren Curtis, during her lifetime, and, upon her death, to divide the corpus into two equal parts, the one part to be held in trust and the income therefrom paid to his daughter, Evelyn Curtis Young, for life, and the other part to be held in trust for the benefit of his other daughter, Katherine Curtis Vetterlein (now Flynn), for her life, and upon the death of each daughter to pay two-thirds of the principal of such daughter's share to her issue and issue of deceased children, per stirpes, and the other one-third of such daughter's share shall be continued to be held in trust for the benefit of such daughter's surviving spouse, with power in each daughter to revoke the gift of income to her husband, and upon the death of a surviving spouse to pay that share of principal to such daughter's issue, and in the event either daughter should die without issue, her share of principal to fall in for the benefit of her sister and her issue.

The settlor died May 23, 1950.

The instant account was filed because of the death on April 6, 1966, of Edward Hopkinson, Jr., cotrustee. He left a will upon which letters testamentary were granted to Edith S. Hopkinson and Francis Hopkinson, executors. They have joined in stating the instant account, and have made a claim of one percent of the principal as compensation to the estate of the deceased cotrustee . . .

Contemporaneously herewith, the Girard Trust Bank, surviving trustee, has filed a petition for the appointment of Thomas S. Gates, Jr., as successor cotrustee, to serve as such in place of Edward Hopkinson, Jr., deceased . . .

*Application for Appointment of Successor Cotrustee*

The petition for the appointment of Thomas S. Gates, Jr., as successor cotrustee to act with Girard

Trust Bank, surviving trustee, recites, inter alia, that until his death on December 22, 1941, Maurice W. Sloan acted as cotrustee with the corporate trustee; that pursuant to a power reserved by the grantor, he appointed Edward Hopkinson, Jr., as successor cotrustee on January 26, 1942, in place of Maurice W. Sloan, and that Mr. Hopkinson served as such cotrustee until his death on April 6, 1966; that upon the death of settlor's wife, the trust is to be divided into two separate trusts, one for each of his two daughters; that by letter dated September 13, 1946, from the grantor to Edward Hopkinson, Jr., and Girard Trust Company, the then trustees under this deed, the grantor expressed his desire that the same individual as is designated to be successor individual trustee of the trusts under his will be also appointed by the court as successor individual trustee under this deed of trust and that such an appointment be made whenever there is a vacancy in the office. A copy of this letter is attached to the petition. The petition further avers that Thomas S. Gates, Jr., was designated to succeed Mr. Edward Hopkinson, Jr., as successor cotrustee in grantor's will; that Mr. Gates has acted as successor cotrustee of the several trusts under the will of the grantor and has agreed to act as successor cotrustee in this trust as evidenced by his assent attached to the petition, and that all parties in interest, including the grantor's widow (who has since died), grantor's two daughters, succeeding life tenants, and the grandchildren who are all sui juris have joined in the petition for the appointment of Mr. Gates.

Mr. Parrish's report, pages 9-10, points out that the deed of trust does not require that there shall always be an individual cotrustee. The deed merely authorizes the settlor to nominate an individual cotrustee to act "in the event of the death or inability to act . . . of

the individual co-trustee named herein". Mr. Parrish recommends that Mr. Gates be appointed because the settlor wanted to achieve the "same overall management for all my affairs". Under his will he created several testamentary trusts with a corpus presently valued at more than $18,000,000: Frank Trust, 400 Pa. 614 (1960), and Stolzenbach's Estate, 346 Pa. 74 (1942), are cited as authority for the discretion which is lodged in the court to make such appointment.

In view of the foregoing, by my decree dated June 20, 1967, Thomas S. Gates, Jr., was appointed successor cotrustee, to serve as such with Girard Trust Bank, surviving trustee. Awards will be made accordingly.

### Deceased Cotrustee's Compensation

All parties in interest are stated to have notice of the claim by the estate of Edward Hopkinson, Jr., for terminal compensation of one percent of the balance of principal.

Girard Trust Bank, corporate trustee, and Mr. Parrish take the position that half of one percent is fair and reasonable compensation under all the circumstances. They would limit the allowance to $16,498.80 instead of the almost $33,000 requested.

Counsel for the parties have entered into a "Stipulation" of facts. The stipulation, hereto attached, recites, inter alia, that on November 17, 1937, the date of the deed of trust, an officer of Girard Trust Company wrote settlor a letter concerning the trustees' compensation; that no direct evidence is available to indicate that Mr. Hopkinson had knowledge of this letter; that since the inception of the trust the Girard has received income commissions of two and one-half percent and Mr. Hopkinson has received from income one percent of the income which, in Mr. Hopkinson's case, amounted to $13,000 commissions during the entire period he was cotrustee; that Mr. Hopkinson

participated actively in making investment policy and all investments were *approved* or *initiated* by him; that Girard performed all ministerial functions including its own review of investments; that upon settlor's death Mr. Hopkinson, as individual trustee, together with an officer of Girard became members of the Board of Directors of Collins & Aikman Corporation; that the officer from Girard served as director until his death in 1960 and Mr. Hopkinson served as a director until his death; that in addition to serving as a director, Mr. Hopkinson also served as a member of the executive committee of the board and as a member of its salary and bonus committee, and for these services to the Collins & Aikman Corporation Mr. Hopkinson received *special compensation* from *this trust* in the amount of $1,800 per annum for the years 1952 through 1965, and $480 for the period of his life in 1966; that Mr. Hopkinson was a distinguished financier, widely respected for his business acumen and vast knowledge of financial affairs and his services were beneficial to the trust; that settlor's daughters are aged 55 and 53 years, respectively.

Mr. Parrish, in his report, pages 10-16, states that the compensation letter referred to in the stipulation (a copy of which is attached to Mr. Parrish's report) provides that the corporate trustee is entitled to an income commission of two and one-half percent and a principal commission of two percent, and that the individual trustee was to receive one percent on both income and principal.

Mr. Parrish and Girard concede that while as a general rule the trustee is not entitled to compensation from principal until the termination of the trust, it is also a general rule that the trustee may be entitled to compensation on the termination of *his connection* with the trust: Kennedy Trust, 364 Pa. 310 (1950). Kennedy also stands for the proposition that

an agreement between the parties as to compensation is controlling.

There is no evidence here of any agreement between Mr. Hopkinson and the settlor as to Mr. Hopkinson's compensation. And, as mentioned above, it has been stipulated that there is no "direct" evidence that Mr. Hopkinson knew of the trustees' compensation letter of November 17, 1937. It would be more than passing strange, however, for claimant to have accepted his annual commission of one percent on income without knowledge or inquiry as to what his cotrustee was receiving, and the existence of the letter of contract which determined the rate of terminal commission as well. In a similar situation in Chester County, the Orphans' Court held the individual executor *bound* by the terms of a compensation agreement to which the corporate executor was a party and by whom it was paid: Bell Estate, 7 Fiduc. Rep. 1, 15 (1956).

Aside from the limitations set forth in this letter, Mr. Parrish cites Gardner's Estate, 323 Pa. 229 (1936); Quigley's Estate, 329 Pa. 281 (1938); and Wallis Estate, 421 Pa. 104 (1965), as limiting the fiduciaries' compensation in a large estate to three percent. And it is contended by Mr. Parrish and Girard that, since the corporate trustee's compensation from principal is fixed at two percent by the agreement, the aggregate commission of all successive individual trustees from principal should not be more than one percent covering the entire duration of the trust. It is further suggested that Mr. Gates as succeeding cotrustee will be entitled to compensation from principal when his connection with the trust is ended. And it is also stated that since Mr. Gates's service will probably continue for a period as long as Mr. Hopkinson's, it is only fair that he should be free to claim an equal rate of compensation.

Counsel for the claimant argues that in 1942 when Mr. Hopkinson assumed his duties as cotrustee the trust res had a book value of $767,000, with the Collins & Aikman stock the largest asset. Subsequently, cash in the sum of $228,000 was added to the trust by the settlor. At the time of his death the trust had a market value of $3,300,000, due in large measure, it is alleged, to Mr. Hopkinson's expertise and his investment policies. The allowance of the one percent commission when added to the $13,000 commission received by Mr. Hopkinson from income would make a total compensation payable to him of $46,000 for his 24 years of service as trustee. The other payments to Mr. Hopkinson of $1,800 per year as a director of Collins & Aikman and as a member of its executive and other committees were aside from his service as cotrustee and were paid to him with full knowledge of all parties and at the express direction of the settlor in recognition of Mr. Hopkinson's expert business and investment abilities.

The Act of July 25, 1963, P. L. 305, amends the Fiduciaries Act of April 18, 1949, by adding section 985 thereto, 20 PS §320.985, and provides:

"The court shall allow such compensation to the trustee as shall in the circumstances be reasonable and just, and may take into account the market value of the trust at the time of the allowance, and calculate such compensation on a graduated percentage". See also Lovering Trust, 27 D. & C. 2d 501, 12 Fiduc. Rep. 361 (1962).

It seems fair and equitable that the same yardstick which has been applied to evaluate the trustee's services during life shall also apply after death. With certainty we can say that this measure is the relationship which Mr. Hopkinson's compensation bore to that received by the corporate trustee. This proportion Mr. Hopkinson must have known from the current income

accountings which were undoubtedly furnished to him as well as to the income beneficiary. This 2½ to 1 relationship he accepted, even if he was incredibly unaware of the contract letter. Apparently he was content with his compensation, but if not, he was still duty bound to exercise his skill and expertise, exceptional though it might be, to the highest degree in discharge of his fiduciary responsibility to the trust. As stated by our Supreme Court in Stirling's Estate, 342 Pa. 497, 504, " '. . . if the trustee has greater skill than that of a man of ordinary prudence, he is under a duty to exercise such skill as he has': Restatement, Trusts, section 174".

Counsel for claimant apparently accepts a three percent ceiling on terminal commissions as proper in a trust of this size, although the cases do not lay down any hard and fast rule. After careful consideration of all the facts and the law, the auditing judge believes that the suggestion of the guardian ad litem and the corporate trustee, viz., a rate of one-half of one percent, will allow the estate of Mr. Hopkinson the "reasonable and just" compensation which the law prescribes.

### Self Dealing

After the hearings appeared to be concluded and Mr. Parrish had filed his report, counsel for the corporate trustee, counsel for the estate of the deceased cotrustee and Mr. Parrish entered into another "Stipulation of Counsel" which is dated November 30, 1967, and is hereto attached.

That stipulation of admitted facts recites:

"(1) In six instances the trustees—Mr. Hopkinson and the Girard—bought bonds from Drexel & Co. as principal at a time when Mr. Hopkinson was a partner of Drexel & Co. The details and results of these transactions are shown in exhibit 'A' attached hereto.

"2. When Drexel & Co. acquired the bonds involved

in the six transactions, it did so with the express intention of reselling them promptly to its customers and in fact did so.

"3. In transactions Nos. 1 through 5, the bonds were bought at the time of original issue and Drexel & Co. was one of the underwriters of each issue.

"4. In transaction No. 6, Drexel & Co. was not an underwriter and bought the bonds from another firm for the specific purpose of filling an order previously placed by the trustees.

"5. The demand for the Pennsylvania Turnpike bonds involved in transactions Nos. 1 and 2 was so great that Drexel & Co. could readily have sold more bonds than were available to it as a member of the underwriting syndicate.

"6. In every instance where Drexel & Co. acted as an underwriter, its participation was widely advertised in the Philadelphia newspapers and other financial publications.

"7. The loss sustained by the trust on transaction No. 6 reduced the trust's federal income tax for the year 1956 by approximately $280".

As a result of these sales by Drexel & Co. to the estate, profits were realized by Drexel & Co. and certain losses have been sustained by the estate, as indicated in exhibit "A" attached to the stipulation.

Items 4 and 5 of exhibit "A" involve Pennsylvania General State Authority bonds which mature in July 1968, at par, at no loss to the estate, and are included in the list solely for information.

The guardian ad litem contends that the other transactions listed in exhibit "A" disclose self-dealing on the part of the individual trustee which subject the trustees to surcharge for the profits realized by Drexel & Co. and the losses sustained by the estate.

Section 170 of the Restatement of Trusts 2d, provides that a "trustee is under a duty to the beneficiary

to administer the trust solely in the interest of the beneficiary".

As a corollary of this rule, Comment *h* states:

"The trustee violates his duty to the beneficiary if he sells to himself as trustee his individual property or property in which he has a personal interest of such a substantial nature that it might affect his judgment. It is immaterial that the trustee acts in good faith in purchasing the property for the trust, and that he pays a fair consideration. This is true whether he purchases for the trust property which he owns individually, or property owned by a firm of which he is a member, or property owned by a corporation in which he has a controlling or substantial interest".

The Restatement then, by way of illustration, states:

"2. A is trustee for B. A is a member of a firm of bond dealers. A purchases for the trust certain bonds owned by the firm. He commits a breach of trust in so doing".

Mr. Parrish cites Downing Estate, 162 Pa. Superior Ct. 354, affirmed per curiam, 359 Pa. 534 (1949), and Comerford Estate, 388 Pa. 278 (1957), in support of his position. Both cases adopted the rule of the Restatement.

In Downing Estate the court stated, page 359: "We do not agree that the rule is limited to cases where the trustee is absolute owner of the property sold to the trust. 'Such a purchase is improper not only where the property sold to the trust was property owned by the trustee absolutely but also where it was property in which he had an interest of such a substantial nature that it might affect his judgment in making the purchase': Scott on Trusts, Vol. 2, 170.12, p.877. See Haggerty v. Squire et al., 137 Ohio St. 207, 28 N.E. 2d 554, 559. The test in cases like the present is whether the trustee has a 'personal interest of such a substan-

tial nature that it might affect his judgment': Restatement, Trusts §170, comment (h).

"By definition and of necessity, the trustee's substantial personal interest may fall short of complete ownership. Such substantial interest may exist where the property sold to the trust is owned by a firm of which the trustee is a member, or where the property sold is owned by a corporation in which the trustee has a controlling or substantial interest. Restatement of Trusts §170, comment (h). . . . "

The authorities thus make it very clear that the test is not *was* his judgment affected but *might* it be.

Counsel for the estate of the deceased trustee agrees that the burden of justifying the action of the trustees is upon them, citing Archambault Trust, 3 Fiduc. Rep. 366 (1953). Counsel lists three exceptions to the rule against self dealing.

The first exception cited by counsel rests on dictum in McGuffey Estate, 123 Pa. Superior Ct. 432 (1936). However, the dictum in McGuffey was repudiated by our Superior Court in Downing Estate, where, in a footnote at page 360, the court stated:

"Statements in McGuffey's Estate . . . not in harmony with the cases of Tracy et al. v. Central Trust Company, 327 Pa. 77, 192 A. 869, and Lewis Estate, 349 Pa. 455, 37 A. 2d 559, must be disregarded".

The second exception cited by counsel rests on comment *l* of section 170 of the Restatement of Trusts 2d, which approves of investment by a corporate trustee in mortgages bought with its own funds if they were acquired for the purpose of distribution to its trust estates and only short periods of time elapsed between the purchases and the distributions. Mr. Parrish very properly points out the distinction between the cited exception to the general rule and the instant matter. The self dealing here involved the purchase by Drexel & Co. of bonds for *resale at a profit*, not for distribu-

tion to estates of which it was a professional trustee. Since Mr. Hopkinson's firm purchased these bonds for resale at a profit, it follows that *his* personal interest was the "substantial interest" condemned in the Restatement regardless of the size of that profit. If the trust company purchases mortgages for purpose of *resale* at a profit, or to further its own interests, it is liable to surcharge: Lewis Estate, 349 Pa. 455; Downing Estate, supra; Tracey v. Central Tr. Co., supra. See also Saeger Estates, 340 Pa. 73 (1940); Greenawalt's Estate, 343 Pa. 413 (1945).

The third exception cited by counsel arises out of general equitable principles as set forth in Guthrie's Estate, 320 Pa. 530 (1936), and Flagg Estate, 365 Pa. 82 (1950), here inapposite.

The conflict resulting from Mr. Hopkinson's positions in the instant matter was not unavoidable. It was not necessary that the bonds be purchased from Drexel & Co. And there is no evidence that the settlor sanctioned the transactions with Drexel & Co. *as a principal.*

The self dealing here involved is not justified on this record. This being so, the trustees are liable for the losses sustained by the estate (Downing Estate, supra), and the profits realized by Drexel & Co.: Restatement of Trusts 2d, §206-e; Mosser v. Darrow, 341 U. S. 267, 71 S. Ct. 680 (1951). The trustees are not entitled to any credit for unrealized gains upon bonds that will mature some time in the future. Nor are they entitled to any credit for any resulting tax savings that might inure as a result of the losses.

As pointed out by the guardian ad litem, the rule stated by Bogert on Trusts & Trustees, 2d ed., §543, p. 476, should apply:

"In its desire to guard the highly valuable fiduciary relationships against improper administration, the court deems it better to forbid disloyalty and strike

down all disloyal acts, rather than to attempt to separate the harmless and the harmful by permitting the trustee to justify his representation of two interests.

"In most cases it is unnecessary for the trustee to act in two capacities, in order to advance trust administration, and in permitting self dealing to enter the trustee is gratuitously exposing the beneficiaries to a risk. If peculiar circumstances make it necessary to allow the trustee to act for himself as well as for the beneficiaries with regard to a particular transaction, relief can be had by an application to the court".

The trustees will be here surcharged, as above, as itemized in Exhibit "A" attached to the stipulation, the sum of $2,488 profits realized by Drexel & Co. and the sum of ($2,947 less $572) $2,375 losses realized by the estate, or a total of $4,863.

It may seem harsh that the corporate trustee should be surcharged for the profits enjoyed by the individual trustee, but the law is clear that a trustee shares responsibility for a breach by his cotrustee which he could prevent or in which he acquiesces even though he does not participate: Restatement of Trusts 2d, §224(2)(c) and (e). The penalty for self dealing is inexorable. As a trustee must account for the profits of self dealing in which he has permitted his agents to indulge, so must a cotrustee be surcharged for profits which he did not share. This rule was enforced in Mosser v. Darrow, supra, where the trustee was surcharged for the profits reaped by his two employees although there was no suggestion that he personally had profited. The court reasoned as follows, p. 273: " . . . it is difficult to say that there was no injury to the estate of the trust through these transactions. But equity has sought to limit difficult and delicate fact-finding tasks concerning its own trustee by precluding such transactions for the reason that their effect is often difficult to trace, and the prohibition

is not merely against injuring the estate—it is against profiting out of the position of trust". In the matter of self dealing a trustee cannot wear the halo of fiduciary rectitude without donning the robe of inflexible loyalty.

There is no allegation of fraud or bad faith upon the part of either Mr. Hopkinson or Girard, and the auditing judge expressly finds that there was none. Hence, while there is present an infraction of the rule against self dealing, we will not deprive the estate of the deceased trustee from compensation entirely: See Landis Trust, 382 Pa. 486, 506 (1955). Since the commission allowed Mr. Hopkinson's estate exceeds the amount of the surcharge, no loss will fall upon the Girard. . . .

And now, July 24, 1968, the account is confirmed nisi.

SUR EXCEPTIONS TO ADJUDICATION

LEFEVER, J., December 13, 1968.—The sole issue raised by the exceptions is the amount of commission on principal to which the estate of the deceased individual trustee is entitled.

Determination of the proper amount of principal commissions to be awarded to a trustee for services rendered to a trust estate is most difficult, especially in the case of an individual cotrustee who dies before termination of the trust. There is no precise formula therefor. Guidelines for determining the amount of compensation were enunciated by President Judge Klein in Wolfsohn Estate, 20 D. & C. 2d 639, at 645:

"Questions involving compensation of executors and other fiduciaries have been before our courts on countless occasions in the long history of our Commonwealth. A great many cases involving every phase of the problem are cited in 1 Hunter, Pa. Orphans' Court Commonplace Book (2d ed.) starting at page 251, under the title 'Commissions.' From a careful

study and analysis of these cases several basic rules can be ascertained:

"1. That fiduciaries are entitled to fair and just compensation;

"2. That such compensation is based upon the responsibility undertaken, the care, skill, time and labor expended, the difficulties encountered in the administration and its success as a whole;

"3. That although, as a matter of convenience, the compensation may be fixed by rule of thumb as a percentage of the fund involved, the true test is always what the services were actually worth under all the circumstances of the case; and

"4. That each case is sui generis".

We have made a careful review of the record of this case in light of these precepts. This has disclosed a number of factors favorable to increasing the amount of compensation on principal to be allowed the deceased individual trustee, viz: (1) Edward Hopkinson, Jr., the individual cotrustee, was a lawyer and financier of national prominence, who was a partner in Drexel & Co. and J. P. Morgan & Co., and a director of many large and important corporations; his financial genius was widely recognized and his advice was much sought; (2) Mr. Hopkinson served as successor individual cotrustee for 24 years, during which period the principal of the Trust Estate increased from $995,000 to $3,300,000 owing largely to his expertise and acumen: see Lovering Estate, 27 D. & C. 2d 501; Section 985 of the Fiduciaries' Act of 1949, as amended, 20 PS §320.985; (3) the learned auditing judge ruled that "there is no evidence here of any agreement between Mr. Hopkinson and the settlor as to Mr. Hopkinson's compensation. And . . . it has been stipulated that there is no 'direct' evidence that Mr. Hopkinson knew of the trustees' compensation letter of November 17, 1937", and he indicated that Mr. Hopkinson may well have

known of the existence of this letter; however, the burden of proving that Mr. Hopkinson agreed to be bound by this contract was upon the beneficiaries of this trust and they have not met the burden; (4) a financier of Mr. Hopkinson's caliber is accustomed to demand and receive substantial compensation for his services: Wolfsohn Estate, supra; and (5) the settlor, a wealthy and capable industrialist, designated Mr. Hopkinson, as successor trustee, because of his special ability and outstanding reputation in financial matters: Wolfsohn Estate, supra.

We are well aware of the familiar principle of law that the allowance by an auditing judge of compensation to a fiduciary will not be lightly overruled: Redmond's Estate, 21 D. & C. 497, 501; see Binenstock Trust, 38 D. & C. 2d 633, 641, affirmed per curiam, 426 Pa. 604. However, after considering all of the factors in this case above enunciated we are all satisfied that fair and reasonable compensation from principal of this trust for Mr. Hopkinson's services is $30,000. With the express concurrence of the learned auditing judge, we so rule and modify his adjudication to that extent.

We all agree that the surcharge of $4,863 was properly imposed. Like Caesar's wife, a trustee's conduct must be above suspicion. The penalty of surcharge is imposed to discourage self dealing, even though, as here, no fraud was involved. In addition to the cases cited in the adjudication, we add Magruder v. Drury and Maddox, 235 U.S. 106. Moreover, losses suffered from improper conduct of a trustee cannot be offset by gains arising therefrom, except where they occurred in a single transaction, which was not the case here. Therefore, the surcharge of $4,863 will be deducted from the compensation of $30,000 awarded above, leaving a net of $25,137, which is awarded to

Edith S. Hopkinson, surviving executrix of the estate of Edward Hopkinson, Jr.

Accordingly, the exceptions are partially sustained, and the adjudication, as herein modified, is confirmed absolutely.